# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,
Plaintiff and Respondent,
v.
EDWARD MATTHEW WYCOFF,
Defendant and Appellant.

S178669

Contra Costa County Superior Court
5-071529-2

---

August 23, 2021

Justice Jenkins authored the opinion of the Court, in which Chief Justice Cantil-Sakauye and Justices Corrigan, Liu, Cuéllar, Kruger, and Groban concurred.

---

PEOPLE v. WYCOFF

S178669


Opinion of the Court by Jenkins, J.


Defendant was charged with the first degree murders of his sister and brother-in-law. (Pen. Code, § 187.)[1] The information also alleged, as to each murder, a multiple-murder special circumstance allegation (§ 190.2, subd. (a)(3)) and enhancement allegations based on the use of a deadly or dangerous weapon (a knife and a wheelbarrow handle) (§ 12022, subd. (b)(1)). During pretrial proceedings, a psychologist examined defendant at the request of the court and issued a report stating that, due to "severe mental illness," defendant had "a misperception of [his lawyers'] motives, a misunderstanding of the risk involved [in his case], a minimizing of the precariousness of his predicament, and impaired judgment." The psychologist's report added: "Because of his grandiosity, [defendant] is not able to rationally consider 'telling his story' with the assistance of an attorney. On this ground, I find him incompetent to stand trial." There was no expert evidence in the record contradicting that conclusion. The trial court, however, rejected the psychologist's opinion without initiating the competency procedures set forth in sections 1368 and 1369, concluding instead that defendant was mentally competent.

---

[1]     All further statutory citations are to the Penal Code.

1

At his guilt trial, defendant waived his right to counsel, represented himself, and testified in his own defense. He treated the trial like an entertainment show, made numerous jokes, and admitted all the facts underlying the charges. After deliberating for less than two hours, the jury convicted him of both counts of first degree murder and found true, as to both murders, the special circumstance allegation and the enhancement allegations.

Defendant again represented himself at the penalty phase. He continued to engage the jury in ways that illustrated his mental illness and grandiosity. The jury took about an hour to return a verdict of death.

Defendant's jocularity continued at sentencing. At defendant's request, the court held the sentencing on defendant's birthday. On that day, defendant said: "Welcome to my birthday party. [¶] Is everyone having fun? Is everyone having a good time?" The court then sentenced defendant to death for each of the murders.

This appeal is automatic. (§ 1239.) We reverse the judgment as to both guilt and penalty on the ground that, before the guilt trial, the court was presented with substantial evidence of defendant's mental incompetence — specifically, his inability, due to mental illness, to consult rationally with counsel — and therefore the court was obligated to initiate the competency procedures set forth in sections 1368 and 1369, which it failed to do. In light of this conclusion, we do not address the remaining issues defendant raises on appeal.

## I. FACTS

### A. Guilt Phase

#### 1. The Prosecution's Case-in-Chief

Julie and Paul Rogers were murdered in their home in El Cerrito in the early morning hours of January 31, 2006. Two of their children — Eric (age 17) and Laurel (age 12) — were also home at the time. A third child, Alex, was away. The children awoke to the sound of a struggle. Eric looked into the hallway and saw a large-framed person,[2] dressed in black, wearing a motorcycle helmet. The person was struggling with someone, whom Eric took to be one of his parents. Eric went into Laurel's room and called the police. When the noise of the struggle subsided, Eric and Laurel found their father, Paul, face down on the floor in the master bedroom, with a knife in his back. Paul told Laurel, "It was your uncle." When Laurel asked if he meant her Uncle Ted, Paul nodded in agreement.[3]

About this time, police arrived. In the master bedroom, they found Paul, still alive, lying on his stomach. He had a bump on his forehead and stab wounds in his back. One of the officers asked Paul who had attacked him, and Paul answered: "My brother-in-law Ted." Paul was not able to give any more details before he died. Another officer followed a trail of blood down the hallway, through the kitchen, and out the sliding glass door. He located Julie near the swimming pool. She was bleeding profusely but breathing. She had a large wound to her abdomen,

---

[2] Defendant testified that at the time of the murders he was 6 feet 5 inches tall and weighed 300 pounds.

[3] Defendant — Julie's brother — goes by the name Ted among family.

exposing her intestines. She was transported to the hospital, but efforts to save her life were unsuccessful.

Defendant was arrested a few hours after the murders, at a hospital near his home in Citrus Heights. At the time of arrest, he had a cut on his left hand and a large cut on his right leg. He also had various scratches and abrasions on his chin and hands. Items that matched debris at the murder site were found in his van and home. The next day, February 1, 2006, officers interviewed defendant after advising him of his rights. (See *Miranda v. Arizona* (1966) 384 U.S. 436.) The interview was recorded and admitted into evidence. In the interview, defendant confessed that he had committed the murders and also that he had planned them in advance. He explained that Julie and Paul "were really bad, rotten people." Paul was a "communist" and "way over to the left." Julie and Paul were lax parents who drank in front of their children, maintained a filthy home, and neglected their dogs. As a result, the children were undisciplined and disobedient. Defendant thought that after killing Julie and Paul, he could "offer the kids to come live with [him]" and "raise them right."

Defendant chose January 31, 2006 as the day for the murders, because that was the 20th anniversary of the day his father had knocked down his grandmother, causing her to break her hip. He decided against using a gun for the murders, because he did not want the murders to be "another statistic that liberals could use" to argue in favor of gun control. Therefore, he chose to commit the murders with a knife, although he also bought a wheelbarrow handle.

When he arrived at Julie and Paul's house to commit the murders, defendant began to have second thoughts. He

explained to his police interviewers: "For like several minutes, I was going through my mind, okay, this is what I'm gonna do, this is where I'm gonna go, rehearsing it in my mind. And I just really didn't want to do it, but I told myself this is something that has to be done. These are horrible, rotten people, and, you know, what they're doing to their kids. It's just something that has to be done. And I forced myself to do what had to be done." Defendant then entered the house by smashing the window next to the front door. As a result, the wheelbarrow handle broke in half. Defendant found Julie and Paul awake. He stabbed Paul, but the knife got stuck. He then went after Julie, following her out the backdoor. He hit her and stabbed her with the broken wheelbarrow handle. Then, he fled.

Defendant also described for the police various grievances he had against his sister, including the division of their father's estate and the care being provided for an elderly aunt, but more generally, defendant believed that Julie and Paul were evil people. He said: "I set out to make the world a better place. And I set out . . . , you know, to [¶] . . . [¶] fight against evil." About killing people, he said, "It's murder. It's wrong," but he added: "What I did, I don't . . . see it as murder, you know. I see it as something, you know, a bunch of moral steps that had to be taken. [¶] . . . [¶] I felt that [Julie's] life was getting more and more screwed up, and she was screwing up her kids. And she was screwing up everyone else, everything around her. And they had just turned into some really evil people. [¶] . . . [¶] I do believe in self-defense. And I think it's okay to, you know, do something like this in self-defense." He further explained: "This is something you do to somebody when they deserve it, you know. I don't like this kind of stuff." In the same vein, he said: "Well, you know, I'm kind of happy because, you know, I guess

you could call it leveling. I may have leveled some karma, you know. I stopped an evil person in this world that had too much power. [¶] I mean some people like, you know, Adolf Hitler, you know . . . , if you could just kill Adolf Hitler before he did what he did."

Other prosecution evidence included notes taken by a reporter from the Contra Costa Times. The parties stipulated that if called as a witness, the reporter would testify that he visited the Martinez jail on Friday, February 3, 2006, and defendant confessed to him. According to the reporter's notes, defendant repeated several of the things he had told the police, including his opinion that the murders were necessary to eliminate "bad people" who were politically "liberal," thus "mak[ing] the world a better place." In addition, on June 4, 2009 (shortly before jury selection), officers searched defendant's jail cell and found handwritten poetry. The poems were in the form of confessions, describing the murders in a triumphant tone and with gruesome detail.

### 2. The Defense Case

#### a. Defendant's Testimony

As noted, defendant represented himself and testified during his trial. His apparent strategy was to relate the entire story of his lifelong relationship with his sister, hoping to persuade the jury that he only did what needed to be done. The trial court allowed the testimony — which included lots of side stories, hearsay, and speculation — for the limited purpose of enabling the jury to evaluate defendant's state of mind at the time of the murders. Defendant's testimony repeated the details that he had described in his police interview. He generally portrayed Julie as manipulative and selfish, seeking to cheat

him out of his inheritance, and he portrayed Paul as weak and closely allied with Julie in her effort to cheat him.

Eventually, defendant decided to kill his sister, but he thought it was a "big thing" to do, so he climbed a hill in the desert near Mojave and prayed about it. He asked God to intervene to stop him — perhaps by creating a traffic accident — if God did not want him to follow through with his plan. Then he heard a rumbling sound in the sky. (Edwards Air Force Base is located near Mojave.) Defendant understood the rumble to mean "prayer received," and during the next week, everything was normal — that is, there was no unusual circumstance that obstructed defendant's plan. Then, Julie, who was having her house renovated and needed to store excess furniture, arranged to have a piano shipped to defendant's home in Citrus Heights. Defendant recalled that 20 years before, when his father had knocked down his grandmother, the underlying dispute between his father and his grandmother had been about moving a piece of furniture. In defendant's mind, Julie's decision to move the piano "matched." Defendant told the jury: "Now, if that is not a sign from God to kill Julie and Paul, then I don't know what is."

### b. Cross-examination

On cross-examination, defendant readily admitted that he planned and intended both murders, and he added that he would celebrate them. The prosecutor asked: "You mean the fact that they died on January 31st, you're going to celebrate that?" Defendant responded: "Oh, of course. You know, . . . it's not a good thing to have to do, but, you know, it had to be done. But, you know, it is something to celebrate when you get some

7

awful person that is ruining people's lives, . . . and you make a correction like that."

Defendant also said about Julie and Paul's deaths: "I'm proud of that. I accomplished something." He expressed anger that Julie did not work, though his parents had paid for Julie to go to college, whereas he worked, and he had paid his own way through trucking school.

### 3. Closing Argument

Defendant began his closing argument by asserting that the prosecutor was a "bad little man" for presenting trial exhibits that depicted Julie's naked dead body. He also called the prosecutor the "persecutor," which was a nickname he used several times throughout the trial. Defendant had earlier joked that, whereas the prosecutor represented "the People," he represented "the person." During closing argument, defendant repeated this joke, saying: "Well, anyway, [the prosecutor] doesn't represent the People. The person represents the People. . . . The person represents the People more than the People do." About the poems he had written describing the murders, he argued that "it's good to write songs and dance about tyrants getting beaten," and he offered the Star-Spangled Banner as an example. Later in his argument, he said: "I do not deserve punishment for this. I deserve award and reward and to live a beautiful, peaceful life for this. You know, people need to look up at me and appreciate me for this . . . ." He also characterized himself as a heroic vindicator of good over evil. He said: "A favorite saying of mine is, The only thing necessary for the triumph of evil is for good men to do nothing. Well, I am a good man, and I sure as hell did do something."

### 4. Verdict

The jury deliberated for less than two hours. It found defendant guilty of both counts of first degree murder. It also found true, as to both murders, the multiple-murder special circumstance allegations and the deadly weapon enhancement allegations.

## B. Penalty Phase

### 1. Defendant's Opening Statement

Defendant began his opening statement with this comment: "For the wrong decision that was made yesterday, when do I get to beat the amoral tar out of these lumpers?"[4] Then, discussing the murder of Julie and Paul, he said: "I played judge, jury, and executioner. It was cheap. It was, you know, not millions of dollars like all of this."

### 2. The Prosecution's Case in Aggravation

The People introduced out-of-court statements defendant had made on January 31, 2006, and February 1, 2006, when being booked. During booking, defendant asked: "How often do you get something like me in here that does something like that?" He also commented: "You know, I should be executed for this. I believe in the death penalty. That's the way it should go down. I . . . believe in the death penalty. And I should be executed. I mean I think it would make society a more moral place if this was handled the way it should be handled."

The prosecution also introduced recordings of 10 telephone calls defendant made while in custody. In one call, defendant

---

[4] A "lumper" is "a laborer employed to handle freight or cargo." (Webster's 9th New Collegiate Dict. (1990) p. 710.) It is a term often used in the trucking industry.

said he did not want to receive any psychological treatment: "I do not want to go that route. And, uh, I don't want to believe that. Because, uh, the thing is — I made a moral choice, and I don't think there's nothing sick about making a, uh, moral decision. I mean, I, uh, believe that, uh, my sister and brother-in-law were evil and needed to be taken out. And, uh, that's that. I had it all planned out. I planned to raise their kids. And take care of everything. But, uh, it, it, it, uh, didn't turn out right." In another call, defendant said that Julie had married into a "screwed up" family of "faggots." In a third call, defendant said: "I'm just one trait away from being a serial killer." He added: "I have the ability to go out into the world and . . . just kill people. And enjoy doing it. [¶] . . . [¶] . . . There's just one thing, though. I have moral values. And . . . that's the thing that keeps me in check is I have morals, and I try to do good, do good, do good. And . . . it keeps that in check. Now the thing is, I screw up from time to time. You know. . . . [¶] . . . [¶] And it doesn't affect me at all." Then he repeated: "I'm just one trait away from being a real serial killer that just kills people for the fun of it."

Later in the same conversation, defendant commented about his frequent involvement in vehicle accidents like a "truck[] getting hit by a train" and "a truck get[ting] burned." He said: "Now, I didn't do these things on purpose. [¶] . . . [¶] . . . But the thing is, I wonder . . . if my subconscious mind makes these things happen. I enjoy these things. I mean, the serial killer in me enjoys these things, but I don't do 'em on purpose. I don't, you know, screw all that stuff up on purpose, but . . . since I do enjoy 'em, I wonder if my subconscious mind kinda makes it happen every now and then. [¶] . . . [¶] No, . . . I don't try to screw that stuff up. But when it happens, I get out

the video camera, and I videotape it and explain what happens and show the damage . . . , and believe me, there's a hell of a lot of videotapes of that.  I mean, . . . it would just blow you away, the videotapes of damage and destruction on the road.  [¶] . . . [¶] . . . I'm talking hours, hours, hours."  With specific reference to his video of the collision between a train and a truck, defendant said: "When I see people watching the videotape with their mouths agape, I know that I made a good videotape.  I know that I'm doing something right."

The prosecution also read into the record two letters defendant wrote while in custody.  In the first letter, dated April 6, 2006, defendant wrote that he was not like Ted Bundy or the Unabomber, because they are "serial murderers, two bad people who like to harm others."  He added:  "I'm a good person who killed two bad people who liked to harm others."  Defendant also wrote that in most murders, the killer is evil, and the victim is good.  In his case, however, he was the "good guy."  He said:  "I am the victim, not the criminal."

Defendant began the second letter on August 1, 2006, and he completed it on September 11, 2006.  In the letter, he argued that he should be rewarded with paradise for what he had done.  He then described paradise as a place where he would "spend [his] time playing with explosives and blowing stuff up."  At several points in the letter, he wrote the words "Red rum," and at the end of the letter, he revealed that "Red rum" was "murder" spelled backwards.  Defendant also wrote:  "I am facing first degree multiple murder charges, and I am facing the death penalty.  This is the ultimate charge and the maximum punishment.  [¶]  Right now I can rob a bank, steal a car, or even kill again, and this state couldn't punish me one bit more.  I have achieved the ultimate."

In addition, the prosecution presented victim impact evidence. Paul's brother Kent discussed the difficulty of caring for Paul's children after the murder of their parents. Doug Bowman testified that he had grown up with Paul and described the many noble qualities of both Julie and Paul. Julie and Paul "didn't see people as bad, they saw them as what they were, and they really cared for other people, and that was the people they were."

Eric and Laurel also testified, describing their parents in positive terms, and also relating the personal difficulties they faced after the murders. Eric said: "Something that is really important in describing both of them is that, they didn't believe in, like, bad people, like, we struggled growing up, we got in a lot of trouble, and they never thought that we were bad, just that our actions maybe needed adjusting, and they were not vengeful. They wouldn't react out of anger . . . ." On cross-examination, defendant asked Eric about the penalty decision then before the jury, and Eric said: "It would be wrong for you to get the death penalty, you specifically, because you're mentally childish. You're very immature for your age. [¶] I know people who have known you for a long time, and they say you haven't changed much since you were about nine years old."[5]

### 3. The Defense Case in Mitigation

#### a. Direct Examination of Defendant

Throughout his testimony, defendant continued his habit of calling the prosecutor the "persecutor," and he said that he

---

[5] This answer was consistent with a trial court ruling that allowed Eric to testify about the appropriate penalty only in the context of describing defendant's character.

(defendant) had "won that free trip to Prisneyland," a play on the word "prison." He then commented that "this audience was comically challenged," and he specifically mentioned the fact that his tie was tied in the shape of a hangman's noose. He next complimented Eric, adding: "I did a good job in getting rid of the parents, it was a good thing to do, it helped a lot." He also said: "Some people think I'm a bad man or an evil man, but you know, if I was . . . really an evil man, I would have killed the kids right there, but I didn't do that, see. So, I am a good person for that."

Referencing his statement that he was "one trait away from being a serial killer," defendant conceded that it was true, arguing that he "used it positively" by killing only when necessary. He said: "What I meant was, you know . . . , I can do stuff like this, you know, I got the ability, but my wanting to do good, my morals keep me in check. . . . But what proves that I'm a real man is that, if I have to do something like this, I will do it." Then, about the death penalty, he said: "It's wrong to just throw a person away like that."

Defendant also testified that he had saved the state money by killing bad people without the need for a costly trial, saying that he had "played judge, jury, and executioner." In addition, he pointed out the humor in the recording of him talking to his uncle on the telephone while a cuckoo clock sounded in the background. He said: "I was telling him what happened" and "while I am talking about all this crazy stuff, you hear this dome, cuckoo, dome, cuckoo, dome, cuckoo. . . . Uncle Charlie probably heard that and thought, yeah, he is cuckoo." Defendant also mentioned his usefulness to society: "The world out there could really use a man like me. They need a man like me to protect America's explosive supply and stuff."

Defendant next introduced into evidence 25 homemade video recordings, showing his various adventures. While the video-player was being set up, defendant coughed and then joked: "Wow, I almost choked to death on this water. I almost saved this state thousands of dollars in death penalty fees. [¶] Oh, well, I guess there will still have to be an execution."

The videos were then played for the jury. Several of the videos showed defendant enjoying nature and socializing with friends and family, including with Julie and Paul and their children. Other videos demonstrated that defendant was an experienced and resourceful truck driver. Generally speaking, the videos presented defendant as an amiable person with a keen sense of humor, although one who finds entertainment in things that are dangerous, transgressive, or out of the ordinary. For example, one video depicted defendant lighting bottle rockets indoors and playing recklessly with a blowtorch. Another showed defendant gleefully giggling about the danger of working with explosives. Several videos showed defendant explaining truck accidents that had just occurred, defendant usually taking great delight in the drama of the accident. One video depicted events that transpired immediately after defendant's truck engine caught fire. Although the fire was relatively small and manageable when it began, defendant did not retrieve the fire extinguisher from his truck, instead getting his video camera. Defendant's failure to extinguish the fire resulted in the destruction of his truck, and it nearly caused a major brush fire.

Defendant ended by reiterating that he was the true victim even though "society" was going to condemn him: "I looked at everything, and I realized no one is going to care about me, no one is going to care that I was truly the victim in this.

They were going to say they were the victims, Julie and Paul were the victims . . . they are not going to see me as the victim . . . . [¶] And . . . it just hit me, wow, from the way society sees it, I should get executed for this. And I saw it coming. I knew this trial was coming. Four years ago, [four] years in the making, I seen it coming, and it just hit me. My God, the way society sees this, I should get executed . . . ." He added: "These people of El Cerrito should thank me and be happy with me as a person for removing two crooks, two rip-off artists from their city. [¶] . . . I don't like to kill, but when I have to kill, I will kill. Sometimes it's something that needs to be done, and I will do it."

### b. *Cross-examination of Defendant and Rebuttal Evidence*

The prosecutor cross-examined defendant extensively regarding the video recordings defendant had introduced, probing whether defendant was in fact the cause of the various problems he purported to be fixing. In response to a question about whether defendant made an effort to avoid damage to his vehicles, defendant said: "I've got a little bit of that serial killer in me. When something breaks, I enjoy it. I have fun with it. I videotape it." Defendant also stated more than once that it was his prerogative to decide between what was moral and what was immoral, and that if someone wronged him, he was entitled to get even by stealing from that person or resorting to other forms of self-help. "I'll pay evil for evil," he asserted. In that context, defendant admitted several incidents of petty criminal behavior and hooliganism.

The prosecutor also offered into evidence a video of defendant displaying a dead cat and describing the fact that he shot the cat twice and then beat it to death with a stick. In the video, defendant related that the cat belonged to a neighbor,

Curtis, and defendant said it was the second of Curtis's cats that defendant had killed. Later in the same video, defendant described "cat war one" and "cat war two," which together included 17 "confirmed cat kills" and many other possible "cat kills."

In addition, the prosecutor offered a video in which defendant lamented graffiti and garbage behind a strip mall near his house. In the video, defendant explained that he used the private road that accessed the loading docks behind the strip mall, and he was angry that, due to the graffiti and the dumping of garbage, the owner had installed gates at either end of the private road. Defendant expressed an intent to vandalize the gates. In his view, installing the gates punished innocent people who used the private road as a shortcut, and the better solution was for the owner to shoot and kill the immoral people who were vandalizing the area and dumping the garbage. He also said that he hated a particular woman who was feeding cats behind the strip mall, and he said he would kill her.

Finally, the prosecutor elicited from defendant that he saw himself as an executioner, not a murderer. Defendant said: "Should the executioner be executed? No. The executioner is doing a job." Defendant also explained that he was well qualified to decide who should be punished and who should not be, because his mind was "not cluttered" and "not polluted" by education. The prosecutor closed his cross-examination with this question: "But you might kill somebody if they left trash behind the warehouse or fed cats, correct?" Defendant answered: "Well, I might do that, yes."

### c. Redirect Examination of Defendant

On redirect, defendant quoted a newspaper horoscope urging him to defend his past actions: " 'Stick up for what you have done in the past.' That's what my horoscope said in yesterday's newspaper. No joke. Sagittarius."

### 4. Defendant's Closing Argument

During closing argument, defendant repeated familiar themes about Julie and Paul being bad people and bad parents, and about how he had solved the problems and thus helped the children. He said: "I chose to better everyone else around me, you know. That's what I'm doing. I'm trying to better everyone. Trying to make everyone happy. I tell these wonderful jokes, and I'm a good person for that, see." Defendant also argued that he had helped Julie and Paul's children by making them less trustful.

Defendant described the trial as a "satirical comedy" in which his role was that of court jester. He said: "Yesterday, you know, yesterday the mood in this courtroom got grim towards the end. It was unlike the other day where I livened it up with the videos and everything. I talked first, and then [the prosecutor] got in there, but the mood got pretty grim at the end of yesterday. And then it was over, we all went home. And you didn't have Uncle Edward to liven it up, but I'm not the one that broke down the attitude and the moods in this courtroom, I'm not the one that broke it down. This man put on this show and depressed everybody, not me, where a couple of days ago . . . I picked it back up with my show. I livened it up. I turned the satirical comedy into a better happy comedy."

Defendant then said: "All of the kids were messed up, but I fixed them. I'm . . . the fixer. I'm the corrector. I corrected

this." Finally, after threatening the prosecutor, defendant concluded his argument by reminding the jury of Eric's statement that he (defendant) should not receive the death penalty, adding: "I'm his favorite uncle, and he appreciates everything I done for him."

### 5. *Verdict and Sentencing*

After deliberating for about an hour, the jury returned a verdict of death as to both counts. At defendant's request, sentencing took place on defendant's birthday.

In regard to the automatic motion to modify the death verdict (§ 190.4, subd. (e)), defendant addressed the court, saying: "You should not sentence me to punishment. Instead, you should set me free. You know, just . . . walk out of here, be done with this. And I can get back to truck driving and making videotapes and running people off the road and things, and, you know, get on with my life, what I was doing before, blowing stuff up and things, and everyone can be happy. I'll be a happy person in society again." The trial court denied the automatic motion.

In regard to defendant's sentence, Julie and Paul's son Eric addressed the court, making a statement in opposition to the death penalty. Eric said: "I think it's very apparent [defendant is] not a normal person, that he struggles with mental issues even if he didn't make that argument. . . . [¶] For us to kill a crazy person, I think would be wrong. As a society, I would hope that we can set a better example . . . ." Eric closed by addressing defendant directly: "Ted, I'm not on your side at all. . . . It's not because I have a particular affinity for you [that I am opposing the death penalty]. It's because I think it would be irresponsible for us to be a punishing and condemning society. [¶] I would hate to see that done in my parents' name."

Finally, defendant addressed the court. He said: "Welcome to my birthday party. [¶] Is everyone having fun? Is everyone having a good time?" He then complained that he did not have the celebrity status that he wanted: "When this trial got started, I . . . gave a little speech, and at the end, I asked if anyone wants any autographs . . . . And not one person, not one single person approached me for an autograph in this whole trial." What followed was a long, meandering statement in which defendant showed little respect for the court. He read poetry that described the murders in graphic detail. He joked about Julie and Paul's wedding, at which the wedding march had become a funeral march. He implied that he had lied in his testimony, saying: "I don't know if any of the jurors noticed — some of them are here today — but you know, when I was taking the oath, I crossed my fingers behind my back with the other hand. Nobody else could see that, but there were some jurors standing behind me. I thought it would be funny, I did that. So they could see it." Defendant also asked to use the overhead projector, and he handed the person operating the projector a picture of a woman's genitals.

When defendant finished, the trial court sentenced him to death for each of the murders. It also sentenced him to one year for each deadly weapon enhancement involving use of a knife, those sentences to be served consecutively. It sentenced him to a year for each deadly weapon enhancement involving use of a wheelbarrow handle, but the court stayed those enhancements.

## II. DISCUSSION

On appeal, defendant raises several guilt and penalty phase issues. We address only the issue of his mental competence to stand trial and to waive counsel, and because we

conclude, based on our analysis of that issue, that the judgment must be reversed in its entirety, we decline to address the other issues.

### A. Facts Related to Defendant's Mental Competence

Defendant was initially represented by Michael Kotin of the Contra Costa County Public Defender's Office. Due to a conflict, defendant's case was reassigned to the Alternate Defender Office, and Daniel Cook took over as defendant's counsel, making his first appearance on March 27, 2006. A few months later, Cook associated David Briggs as *Keenan* counsel. (See *Keenan v. Superior Court* (1982) 31 Cal.3d 424 [trial court has discretion to appoint a second defense attorney in a capital case].) Defendant clashed with Cook, and on November 30, 2006, defendant brought an unsuccessful *Marsden* motion, seeking to replace Cook. (See *People v. Marsden* (1970) 2 Cal.3d 118.) Defendant's main complaints against Cook were that Cook had gone to defendant's house in Citrus Heights without letting defendant know, that Cook had only met with defendant about once per month, and that Cook had unnecessarily delayed the case. A couple of months after that unsuccessful *Marsden* motion, Cook resigned from the Alternate Defender Office, and Roberto Najera became defendant's lead attorney.

Although the relationship between defendant and Najera began well, it eventually broke down, and on January 18, 2008, defendant brought another unsuccessful *Marsden* motion, this time seeking to replace Najera. Briggs, by contrast, had gained defendant's trust, but after Briggs advised Najera and Susan Hutcher (Najera's supervisor) about the importance of meeting often with defendant, Hutcher dismissed Briggs (it is unclear why). Defendant then brought yet another unsuccessful

*Marsden* motion, again seeking to replace Najera. His complaints about Najera were similar to those he had previously made about Cook (i.e., failure to share discovery with defendant,[6] failure to meet with defendant regularly, failure to involve defendant in important strategy decisions). Eventually, defendant refused to cooperate with Najera, even taking steps to sabotage the defense case as a way of punishing Najera.

Defendant then brought a *Faretta* motion, seeking to represent himself. (*Faretta v. California* (1975) 422 U.S. 806.) In presenting the motion, defendant made clear that he had brought the motion primarily because he couldn't work with Najera, not because he truly wanted to represent himself. He said: "I just got to get rid of [Najera]." He added: "I'm willing to represent myself to get [Najera] off my case." The crux of his concern with Najera's representation centered upon his disagreement with Najera over whether to assert an insanity defense. The trial court denied defendant's *Faretta* motion on the ground that defendant was using the motion to relitigate the denial of his *Marsden* motions. Two months later, however, Najera resigned from the Alternate Defender Office. David Headley then took over as defendant's lead counsel.

At that point, David Briggs, whom Hutcher had dismissed, brought a *Harris* motion seeking appointment as defendant's counsel. (See *Harris v. Superior Court* (1977) 19 Cal.3d 786 [trial court has discretion in certain circumstances to replace appointed counsel with counsel of defendant's choice].) The motion was supported by defendant's declaration stating that he was prepared to cooperate with Briggs. But while Headley was

---

[6] Defendant's attorneys confirmed that, for tactical reasons, they did not share discovery with defendant.

still representing defendant and while Briggs's *Harris* motion remained unresolved, defendant brought a second *Faretta* motion. Defendant still did not feel he was getting the respect and deference he deserved. He also explained that he planned to punish his attorneys, because they would not allow him to make strategic decisions in his case. In his moving papers, he wrote: "I will work against my atturneys [*sic*] even if it hurts my case. I will do this to make a point, I said no!" Defendant also stated that he no longer trusted lawyers and that he did not think Headley would be any different from the others. "I don't even want Briggs on the case," defendant added. "This is something I got to do myself." Defendant's primary concern was that he maintain strategic control over the case, and he did not feel that his attorneys gave him that control.

The court decided that, in light of the high court's then-recent decision in *Indiana v. Edwards* (2008) 554 U.S. 164 (*Edwards*), it could not rule on defendant's *Faretta* motion without an opinion from a mental health expert as to defendant's competence to represent himself. The court said that it had "not seen any evidence at all that [defendant] would not be competent to stand trial," but the high court in *Edwards* had distinguished between competence to stand trial and competence to represent oneself at trial, and the trial court explained that it was not sure defendant possessed the latter competency. The court therefore obtained a report from Paul Good, Ph.D., an expert in forensic psychology. In deciding that a mental health evaluation of defendant was needed, the court specifically referenced defendant's "grandiosity" and his "fairly high level of paranoia."

Dr. Good's report stated that he had interviewed defendant on three occasions, and he found "defendant's thought

process . . . clear, coherent and goal directed." Defendant "displayed a concrete ability for abstract thought." Nonetheless, Dr. Good diagnosed defendant as "most probably suffering from Paranoid Schizophrenia," and in any case suffering from "severe mental illness." He based that conclusion "on the presence of paranoid and grandiose delusions, negative symptoms of flattened affect, and long-standing interpersonal alienation."

Although Dr. Good had been appointed to address defendant's competence to represent himself, his report also addressed, in detail, defendant's competence to stand trial. On the latter point, Dr. Good observed that defendant had "a factual understanding of the proceedings and intellectually under[stood] the relationship between attorney and client." Moreover, he added: "Based on the 14 dimensions of the CAI-R, [defendant] would be found competent to stand trial *were he to proceed with counsel.*" (Italics added.)[7] Dr. Good then described everything that defendant understood about the legal proceeding he was then facing. This section of Dr. Good's report makes clear that defendant had a relatively sophisticated grasp of criminal procedure.

Dr. Good next related the history of defendant's contentious relationships with counsel. Defendant told Dr. Good that counsel wanted to pursue an insanity defense, but defendant saw that as a "small victory," one not worth pursuing. He believed his attorneys were "the enemy" and "were locking [him] away so that no one would discover [he] was really sane." Significantly, defendant did not give as much importance as his

---

[7] The CAI-R refers to the "Competency Assessment Instrument-Revised," a tool sometimes used by forensic psychologists to evaluate competence to stand trial.

lawyers did to the goal of avoiding a death sentence. Defendant doubted that a death sentence would ever result in his execution, and if it did, he did not think the execution would occur for a long time. Pointing out that both his parents had died from cancer and that he was overweight, defendant thought he would be much more likely to live out his normal lifespan in prison than to be executed. He also felt that the evidence against him was very strong, and therefore there was not much chance of winning a major victory. Given those circumstances, he thought the dignity of handling his own defense and telling the world his story was more valuable to him than the indignity of submitting to the legal maneuvering of his lawyers, with chances of success uncertain.

Although defendant conceded to Dr. Good that it was "possible" that a jury would accept an insanity defense, he thought it was "very unlikely." He argued that he was "too competent, too sane" to persuade a jury that he had committed the offenses while insane. In this regard, he pointed out that he had worked in difficult jobs all his life, that a successful insanity defense was statistically rare, and that the jury in his case would be death qualified (see *Wainwright v. Witt* (1985) 469 U.S. 412, 424), which in his view meant that it would be less likely to accept an insanity defense. Given all that, he thought it was a better strategy "to try to pick a jury that believes in vigilante justice" and then explain to the jury why he had killed Julie and Paul. He also commented that if he took the insanity route, he would be admitting that what he did was wrong and asserting that he was too insane to appreciate its wrongfulness. Defendant felt very strongly that what he did was *not* wrong.

Dr. Good concluded this section of his report by giving his opinion that defendant was not competent to stand trial. The

report made reference to the legal standard that governs competence to stand trial, noting in particular that a defendant's " 'rational as well as factual understanding of the proceedings against him' " is not the sole consideration; a defendant must also have " 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding.' " (*Dusky v. United States* (1960) 362 U.S. 402 (*Dusky*); see § 1367, subd. (a) [incorporating the *Dusky* standard].) Dr. Good explained that due to defendant's "[s]elf-importance," "prideful independence," and "grandiosity," he "is not able to rationally consider 'telling his story' with the assistance of an attorney." Dr. Good added: "On this ground, I find him incompetent to stand trial." Thus, Dr. Good based his finding of mental incompetence specifically on defendant's inability to rationally consult with counsel.

Dr. Good further elaborated the basis for his opinion. First, Dr. Good directly linked defendant's tumultuous relationships with counsel to his "paranoid mental disorder," explaining that the disorder caused defendant to have a "hypercritical and suspicious stance towards his attorneys." Second, Dr. Good explained that defendant had "a misperception of [his lawyers'] motives, a misunderstanding of the risk involved [in his case], a minimizing of the precariousness of his predicament, and impaired judgment, all of which are symptoms of his paranoid mental state." Dr. Good further stated: "Clinically, I believe [defendant] is in denial about the danger he faces, and he substitutes hostility at those who take seriously his predicament."

A redacted version of Dr. Good's report was provided to defense counsel and the prosecution on the day of defendant's *Faretta* hearing. Although Dr. Good had opined about

defendant's mental competence to stand trial, the trial court limited its discussion with defense counsel to the subject of defendant's mental competence to conduct his own defense in the event that the court granted the *Faretta* motion and relieved counsel.

The court then granted defendant's *Faretta* motion. In its ruling the court said: "On review of Dr. Good's report, and again particularly since I think the standards applicable here under *Edwards* are less than clear, it does appear to me that while there is a diagnosis of paranoia, and [it] appears to be consistent with the court's own observations of [defendant], I frankly do not think it rises to the level that would preclude [defendant] from electing to represent himself should he choose to do so." When defense counsel was prompted by the court to discuss his views regarding Dr. Good's report, counsel told the court: "We trust your reading of it."[8]

On December 17, 2008, about a month after granting defendant's *Faretta* motion, the court appointed David Briggs as "advisory counsel" for defendant. (*People v. Mattson* (1954) 51 Cal.2d 777, 797 [trial court has discretion to "appoint an attorney . . . to render . . . advisory services to an indigent defendant who wishes to represent himself"].) A month after that, on January 27, 2009, a new deputy district attorney made his first appearance in the case, taking over as lead attorney for the prosecution, and on June 26, 2009, the case was reassigned for all purposes to a new judge.

---

[8]    It is apparent from this discussion that the court and counsel focused exclusively on defendant's competence to represent himself, not his competence to stand trial.

On September 10, 2009, as the parties prepared for jury selection, the prosecutor came across a file labeled "1368 issue," a reference to section 1368, which governs situations in which a doubt has arisen about a defendant's competence to stand trial. The prosecutor viewed Dr. Good's report as a potential problem because it declared defendant to be mentally incompetent to stand trial and because there was no expert evidence in the record contradicting that conclusion, meaning that there was no expert evidence to support the trial court's implicit finding of competence. The prosecutor therefore asked the trial court to address the matter. The prosecutor pointed out that Dr. Good had only been appointed to address defendant's competence to represent himself. Nevertheless, Dr. Good had volunteered his opinion that defendant was not mentally competent to stand trial. The prosecutor then expressed his own views regarding defendant's mental condition: "I certainly think [defendant] is competent to stand trial from what I have seen. . . . But with this record I am concerned about any possible issues on appeal." The prosecutor added: "I should note that [defendant has] participated very competently since I have been in this case. He has filed a motion to suppress, which in fact portions of it have been granted. He has raised objections to questions in the [juror] questionnaire. So, I think time and his participation in these proceedings have further illustrated his competency to stand trial. . . . But I want to make sure the record is clear and that this issue is addressed."

Defendant, who at this point was proceeding pro se, then explained to the court that he was forced into representing himself only because his attorneys would not share discovery with him and would not involve him in strategic decisions. Defendant said: "For . . . a little more than two years, I have

tried *Faretta*[ motion]s, *Marsden*[ motion]s, and I would talk to Susan Hutcher and, you know, try and get respect, try and get my things, try and — And I was just constantly, I was at war with the Alternate Defender[] Office. They are the ones that really screwed all of this up, I was at war with them. And finally, after all these *Marsden*[ motion]s, and all of these . . . *Faretta*[ motion]s, [the court] made the decision to grant me my own case pro per. And since that time there has been peace on this case. I am getting what I wanted, I'm seeing everything [(i.e., discovery)], I'm part of the case. I'm getting along with Mr. Briggs . . . . [¶] . . . [¶] . . . I'm not really looking forward to being my own attorney in this big powerful trial. I will do it, but I just don't want to go back to the way things were before . . . [the court] granted me the right to represent myself." Defendant then stated for the record that he was *not* seeking a finding of mental incompetence.

After defendant spoke, the court commented on its own observations of defendant's competence: "The request that is being asked today is that I . . . satisfy myself . . . on the decision to let you represent yourself and . . . satisfy myself that you are competent to go to trial. In other words, [that] you understand what is going on, basically. That is a very short version of the standard. [¶] I can tell you that from our interactions over the last several months I . . . haven't seen any reason to question either of those premises . . . ." The court then took a recess to study the record more fully.

After that recess, the court confirmed that defendant was competent to stand trial. The court said: "Based on all that I have reviewed and . . . my participation in the case and my interactions with [defendant], I do not have any doubt about [defendant's] competency to stand trial. [¶] My view is that

[defendant] clearly understands the nature and purpose of these proceedings, the roles of the respective participants and the fact that this is a matter of utmost seriousness in that it is a potential death penalty case, but he fully understands that [and is] capable of understanding all of the issues that I have discussed." The court then took another recess, this time to study the unredacted version of Dr. Good's report. After that second recess, the court said: "Having read and considered[] the full report by Dr. Good . . . I continue in my beliefs that I have articulated earlier and confirm my findings as to competency . . . ." The court never addressed the specific ground on which Dr. Good had found defendant incompetent, to wit, that defendant lacked a " 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding.' " (*Dusky*, *supra*, 362 U.S. at p. 402.)

The trial court revisited the question of defendant's mental competence three months later, after the jury had reached its death verdicts. The court made the following comment: "I did want to state for the record that in the time we spent on this case over the last several months, and the many days and hours that we have been in court, it's my view, and I don't think I ever had occasion to state it clearly on the record, . . . that [defendant] has at all times demonstrated that he is competent to stand trial and has been competent to stand trial and to waive his right to counsel." Addressing defendant directly, the court stated: "In other words, . . . I believe that [the court] made the correct decision allowing you to represent yourself." Defendant, who had recently been sentenced to death, responded: "Oh, so do I."

Mr. Briggs, who had acted as defendant's advisory counsel throughout the trial, then asked to address the court. He said:

"I feel that I need to respond to the court's comments today. [¶] . . . [¶]  And I do so with all respect, but I disagree with the court's statement[] . . . that [defendant] was competent to represent himself throughout this trial. [¶]  I make this statement *based on evidence to which the court has not been privy, that I am not at liberty to disclose*, but if I remain silent in the face of the assertion, it could be construed as an agreement with it, and I do not agree with it."  (Italics added.)

Defendant then added his own comment:  "As you were saying earlier, uhmm, [the court's] decision for me to represent myself was a very good decision, because, you know, Julie and Paul were attorneys that I killed.  And if [the court] did not let me fire that legal team that was representing me at the time, that legal team would have been the next two attorneys that I killed."

## B. Relevant Legal Principles:  Competence To Stand Trial and Competence To Waive Counsel

At the outset, it is necessary to explain why we are addressing in the same discussion both the question of defendant's competence to stand trial and the question of his competence to waive counsel.  In *Godinez v. Moran* (1993) 509 U.S. 389 (*Godinez*), the high court concluded that the standard that governs both competency determinations is the same.  In reaching that conclusion, the high court listed several decisions of constitutional magnitude that a defendant who stands trial must make.  The court said:  "A defendant who stands trial . . . will ordinarily have to decide whether to waive his 'privilege against compulsory self-incrimination,' [citation], by taking the witness stand; if the option is available, he may have to decide whether to waive his 'right to trial by jury,' [citation]; and, in consultation with counsel, he may have to decide whether to

waive his 'right to confront [his] accusers,' [citation], by declining to cross-examine witnesses for the prosecution." (*Id.* at p. 398.) The high court then said: "[W]e [do not] think that a defendant who waives his right to the assistance of counsel must be more competent than a defendant who does not, since there is no reason to believe that the decision to waive counsel requires an appreciably higher level of mental functioning than the decision to waive other constitutional rights." (*Id.* at p. 399.) Nor did the high court conclude that the required "level of mental functioning" was appreciably *lower* for a decision to waive counsel. (*Ibid.*) Specifically, the high court rejected "the notion that competence . . . to waive the right to counsel must be measured by a standard that is higher than (*or even different from*) the *Dusky*[, *supra*, 362 U.S. 402,] standard" that governs competence to stand trial. (See *Godinez*, at p. 398, italics added.)

Significantly, *Godinez* involved a defendant who pled guilty, and the high court addressed only his decision to waive counsel (and then to enter the guilty plea); it did not decide what level of mental functioning was necessary for a defendant to conduct his or her own defense. The court said: "Respondent suggests that a higher competency standard is necessary because a defendant who represents himself ' "must have greater powers of comprehension, judgment, and reason than would be necessary to stand trial with the aid of an attorney." ' [Citations.] But this argument has a flawed premise; the competence that is required of a defendant seeking to waive his right to counsel is the competence to *waive the right*, not the competence to represent himself. . . . [A] criminal defendant's ability to represent himself has no bearing upon his competence to *choose* self-representation." (*Godinez, supra,* 509 U.S. at pp. 399–400.) In other words, the court severed the question of

competence to waive counsel from the question of competence to self-represent, and it concluded that the waiver of counsel, when viewed in isolation, is not different from numerous other decisions a defendant must make when standing trial, and it was subject to the same analysis and governed by the same standard.[9]

We recently addressed in some detail the legal principles that govern the question of a criminal defendant's mental competence to stand trial, and by implication from *Godinez*, *supra*, 509 U.S. at page 398, the same principles govern a defendant's competence to waive counsel. In *People v. Rodas* (2018) 6 Cal.5th 219 (*Rodas*), we said: "The constitutional guarantee of due process forbids a court from trying or convicting a criminal defendant who is mentally incompetent to stand trial. [Citations.] Section 1367 of the Penal Code, incorporating the applicable constitutional standard, specifies that a person is incompetent to stand trial 'if, as a result of mental disorder or developmental disability, the defendant is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner.' (*Id.*, subd. (a); see *Dusky v. U.S.* (1960) 362 U.S. 402 . . . .) [¶] Penal Code section 1368 requires that criminal proceedings be suspended and competency proceedings be commenced if 'a doubt arises in the mind of the judge' regarding

---

[9] Of course, a defendant who is competent to waive counsel does not necessarily do so knowingly, voluntarily, and intelligently. (See, e.g., *People v. Lynch* (2010) 50 Cal.4th 693, 721.) That is a separate question from the competency question, as is the question whether the defendant has the mental competence necessary to self-represent (see *People v. Johnson* (2012) 53 Cal.4th 519, 530–531).

the defendant's competence (*id.*, subd. (a)) and defense counsel concurs (*id.*, subd. (b)).  This court has construed that provision, in conformity with the requirements of federal constitutional law, as meaning that an accused has the right 'to a hearing on present sanity if he comes forward with substantial evidence that he is incapable, because of mental illness, of understanding the nature of the proceedings against him or of assisting in his defense.'  (*People v. Pennington* (1967) 66 Cal.2d 508, 518 . . . , discussing *Pate v. Robinson* (1966) 383 U.S. 375, 385–386 . . . .)" (*Rodas*, at pp. 230–231.)

In *Rodas*, we stated that the accused is entitled to a hearing " '*if he comes forward* with substantial evidence' " of mental incompetence (*Rodas*, *supra*, 6 Cal.5th at p. 231, italics added, quoting *People v. Pennington*, *supra*, 66 Cal.2d at p. 518 (*Pennington*)), but under section 1368, subdivision (a), it doesn't matter how the evidence comes before the court.  If the court is presented with substantial evidence of mental incompetence — whether or not defendant is its immediate source — the court must declare a doubt about the question and initiate an inquiry, including obtaining a formal opinion from defense counsel and appointing defense counsel if the defendant is proceeding pro se. (See § 1368, subd. (a).)  Moreover, substantial evidence of mental incompetence necessarily raises such a doubt irrespective of whether other evidence, including the court's own observations, suggests the defendant is competent.  On this latter point, we said in *Rodas*: " 'Once such substantial evidence appears, a doubt as to the sanity of the accused exists, *no matter how persuasive other evidence — testimony of prosecution witnesses or the court's own observations of the accused — may be to the contrary.*'  (*Pennington*, at p. 518.)"  (*Rodas*, *supra*, 6 Cal.5th at p. 231, italics added.)

In *Rodas*, we found support for the latter point in *Pate v. Robinson*. We said: "In *Pate v. Robinson, supra*, 383 U.S. 375 . . . , the high court made clear that when substantial evidence of incompetence otherwise exists, a competency hearing is required even though the defendant may display 'mental alertness and understanding' in his colloquies with the trial judge. (*Id.* at p. 385.) The court explained that while the defendant's in-court behavior 'might be relevant to the ultimate decision as to his sanity, it cannot be relied upon to dispense with a hearing on that very issue.' (*Id.* at p. 386.) [¶] This court has followed the same principle: When faced with conflicting evidence regarding competence, the trial court's role under Penal Code section 1368 is only to decide whether the evidence of incompetence is substantial, not to resolve the conflict. Resolution must await expert examination and the opportunity for a full evidentiary hearing." (*Rodas, supra*, 6 Cal.5th at pp. 233–234.) In other words, once a trial court has before it substantial evidence that a defendant is not mentally competent, its own observations of the defendant's competence cannot take the place of the formal competence inquiry under sections 1368 and 1369.

In *People v. Lewis and Oliver* (2006) 39 Cal.4th 970 (*Lewis and Oliver*), we elaborated on what constituted "substantial evidence" in this context: "Evidence is not substantial enough to mandate a mental competence hearing unless it raises a reasonable doubt on the issue. [Citation.] We have said that this standard is satisfied if at least one expert who is competent to render such an opinion, and who has had a sufficient opportunity to conduct an examination, testifies under oath with particularity that, because of mental illness, the accused is incapable of understanding the proceedings or assisting in his

defense." (*Id*. at p. 1047.) The word "substantial" does not mean that for a doubt to arise, there must be a large quantity of evidence of a defendant's incompetence; rather, it means that there must be some evidence of sufficient substance that it cannot be dismissed as being inherently unpersuasive.

## C. Analysis

### 1. Competence To Stand Trial

In this case, the trial court had before it a defendant who was manifestly aware of what was going on in the courtroom and who had demonstrated his ability to understand the proceeding with a high degree of sophistication. Defendant told Dr. Good that he believed the evidence of guilt was overwhelming and that it was unlikely he would be acquitted. That assessment was more than plausible, especially considering Paul's dying declaration implicating defendant and defendant's very detailed confession to police just one day after the murders, a confession that admitted premeditation and deliberation. The chances of an acquittal were negligible. Defendant also believed that an insanity defense would prove unsuccessful, and he was able to articulate his reasons for that conclusion. And defendant gave Dr. Good a rational reason for why he did not fear a sentence of death, asserting his view that the death penalty was not likely to be carried out. Thus, viewing the record from the trial court's perspective, the matter of defendant's incompetence to stand trial was less than clear. On the one hand, defendant presented as a person who very much understood what was happening around him and who had a relatively sophisticated ability to navigate the criminal justice system. On the other hand, there was the uncontradicted opinion of an experienced mental health professional who had

examined defendant on three occasions and concluded that defendant was *not* competent to stand trial, because his mental illness prevented him from consulting with counsel with a reasonable degree of rational understanding.

But the difficulty presented here is also directly addressed by our precedents. Once "substantial evidence" of mental incompetence appears, "a doubt as to the sanity of the accused exists, no matter how persuasive other evidence — testimony of prosecution witnesses or the court's own observations of the accused — may be to the contrary." (*Pennington, supra,* 66 Cal.2d at p. 518; see *Rodas, supra,* 6 Cal.5th at p. 231 [quoting this statement from *Pennington*].) Moreover, we have repeatedly reaffirmed that a finding of incompetence to stand trial can be based solely on a defendant's "incapab[ility] of . . . cooperating with counsel." (*Pennington,* at p. 519; see *People v. Ghobrial* (2018) 5 Cal.5th 250, 270 [quoting this statement from *Pennington*]; *People v. Sattiewhite* (2014) 59 Cal.4th 446, 465 (*Sattiewhite*) [same]; *People v. Lewis* (2008) 43 Cal.4th 415, 525 [same].) On the record before us, we find as a matter of law that Dr. Good's report constituted substantial evidence of such incapability. (See *People v. Mai* (2013) 57 Cal.4th 986, 1033 [requiring an appellate court to defer to a trial court's competency determination unless the evidence of incompetence is substantial "as a matter of law"].) Indeed, Dr. Good's report related defendant's paranoid belief that his attorneys "were locking [him] away so that no one would discover [he] was really sane," and the report included the following passage in bold typeface: "[Defendant's] failure to appreciate the logic and wisdom of his attorneys is a function of his paranoid mental disorder. As a result of his hypercritical and suspicious stance towards his attorneys, [defendant] has not shown the 'present

ability to consult with his lawyer[s].' Each of his past attorneys has failed [defendant's] tests of competency and loyalty, and he is likely to find fault with every new attorney that may be appointed. Self-importance and prideful independence lead [defendant] to believe that only he can represent himself. Because of his grandiosity, [defendant] is not able to rationally consider 'telling his story' with the assistance of an attorney. On this ground, I find him incompetent to stand trial." That conclusion, combined with the psychological testing and background findings that supported it, constituted substantial evidence as a matter of law. Therefore, once the trial court received and read Dr. Good's report, the procedures set forth in sections 1368 and 1369 came into play. (*Pennington, supra*, 66 Cal.2d at p. 518.)

Section 1368, subdivision (a) provides that when a doubt as to a defendant's mental competence arises, the trial court shall "inquire of the attorney for the defendant whether, in the opinion of the attorney, the defendant is mentally competent." In some cases, defense counsel might not agree that the defendant is mentally incompetent; here, however, the court did not make the inquiry. By not initiating a competency proceeding by making that inquiry, the trial court erred. (See §§ 1368, subd. (a), 1369.)[10]

Then, nearly a year later, when a new attorney was representing the prosecution and a new judge had been assigned to the case, the issue of defendant's mental competence was

---

[10] The trial court's focus was exclusively on defendant's mental competence to represent himself (see *Edwards, supra*, 554 U.S. 164), and the court *did* ask defense counsel about that question.

raised anew. Again, Dr. Good's report came to the attention of the court, a report that, as a matter of law, constituted substantial evidence of defendant's mental incompetence. Therefore, the procedures set forth in sections 1368 and 1369 came into play a second time. But at this point defendant was not represented, so the trial court's error was slightly different. Section 1368, subdivision (a) provides that "[i]f the defendant is not represented by counsel, the court shall appoint counsel." By not appointing counsel and initiating competency proceedings, the trial court erred again.[11]

The Attorney General offers several arguments in defense of the trial court actions here — none of which is ultimately persuasive. First, he argues that Dr. Good's report does not, standing alone, amount to substantial evidence of mental incompetence and therefore that the trial court did not err in declining to hold a section 1369 competency trial. The Attorney General relies on *Lewis and Oliver*, *supra*, 39 Cal.4th 970, in which there was testimony from a psychiatrist — Dr. Alvin Davis — that the defendant was mentally incompetent, yet we upheld the trial court's conclusion that the evidence of the defendant's mental incompetence was insubstantial. Our

---

[11]    It is true that Dr. Good's finding of mental incompetence focused on defendant's inability " 'to consult with his lawyer with a reasonable degree of rational understanding' " (*Dusky*, *supra*, 362 U.S. at p. 402), but it does not follow from defendant's dismissal of his attorneys that his competency was no longer in doubt. That is so because Dr. Good made clear that defendant's mental illness was what led to his decision to dismiss his attorneys. If a defendant is mentally incompetent because of an inability to consult with counsel, the dismissal of counsel is not an appropriate remedy.

decision in *Lewis and Oliver* is, however, easily distinguished from this case.

In *Lewis and Oliver*, the trial court determined that Dr. Davis (the psychologist who submitted a report regarding the defendant's competence to stand trial) was not a credible witness. It expressed its reluctance to credit the expert's views regarding mental competence, noting that Dr. Davis " 'is rather well known in the system.' " (*Lewis and Oliver*, *supra*, 39 Cal.4th at p. 1046; see *People v. Farnam* (2002) 28 Cal.4th 107, 197 [describing an effective cross-examination of Dr. Davis, focusing on his qualifications to assess mental competence].) Additionally, the trial court in *Lewis and Oliver* expressly found that Dr. Davis's " 'conclusions are not supported by any factual basis and he disregards evidence that is contrary to what appears to be a prefixed opinion.' " (*Lewis and Oliver*, at p. 1047.) In upholding the trial court, we noted that Dr. Davis's opinion was contradicted by other experts whose views Dr. Davis had not considered. (*Id.* at p. 1048.) In addition, we said: "Dr. Davis acknowledged that he did not consider Lewis's psychiatric history in the Army or in jail. . . . Moreover, Dr. Davis conceded that his conclusion regarding Lewis's competence was tentative and not definitive." (*Ibid.*) In sum, Dr. Davis's opinion, viewed by itself, was inherently unreliable. Accordingly, we held that the trial court in *Lewis and Oliver* had a reasonable basis to conclude that Dr. Davis's opinion did not constitute substantial evidence of mental incompetence.

*Lewis and Oliver* certainly stands for the abstract principle that not every psychiatrist's opinion is substantial evidence. But here the trial court was presented with the uncontradicted opinion of Dr. Good, an expert in forensic psychology chosen by the court, and the record suggests nothing

that would undermine his credibility. Dr. Good's opinion was supported by three interviews with defendant, a thorough psychiatric history, appropriate psychological testing, and detailed reasoning in which he made clear the factual basis for his conclusions. Thus, *Lewis and Oliver* fails to support the Attorney General's argument.

The Attorney General also argues that Dr. Good did not present his opinion in the form of sworn testimony. (See *Lewis and Oliver*, *supra*, 39 Cal.4th at p. 1047 [a doubt arises as to mental competence "if at least one expert who is competent to render such an opinion, and who has had a sufficient opportunity to conduct an examination, *testifies under oath* with particularity that, because of mental illness, the accused is incapable of understanding the proceedings or assisting in his defense" (italics added)].) While it is true that Dr. Good did not testify under oath, he gave his opinion in a formal, signed, 15-page, single-spaced report addressed directly to the judge trying defendant's case and with the understanding that the judge would rely on it as evidence. Those circumstances suffice to make it substantial evidence of incompetence.

Of particular significance here is the thoroughness of Dr. Good's analysis. Dr. Good described his evaluation procedures in detail, summarized defendant's personal background, evaluated defendant's mental status as of the time of the examination, related in detail the factual basis for his diagnosis, and set forth his diagnosis in cautious terms. Having done so, Dr. Good then turned to the specific question of defendant's mental competence to stand trial. Dr. Good readily conceded that in many respects, defendant was competent to stand trial. For example, Dr. Good related in detail defendant's knowledge of criminal procedure. But then Dr. Good addressed the specific

ground on which he concluded that defendant was not competent to stand trial, that is, his " 'present ability to consult with his lawyer with a reasonable degree of rational understanding.' " (*Dusky*, *supra*, 362 U.S. at p. 402.) Dr. Good gave a full history of defendant's dysfunctional relationships with counsel and then directly linked defendant's inability, in practice, to work with counsel to his "paranoid mental disorder," which caused defendant to have a "hypercritical and suspicious stance towards his attorneys." In this regard, Dr. Good particularly noted defendant's "self-importance and prideful independence" and also "his grandiosity," stating, "on this ground, I find him incompetent to stand trial." Dr. Good further noted that defendant's "paranoid mental state" caused him to "minimiz[e] the precariousness of his predicament."

In summary, Dr. Good's opinion was presented to the court in a form that made it reliable, and unlike the opinion of Dr. Davis at issue in *Lewis and Oliver*, *supra*, 39 Cal.4th 970, Dr. Good's opinion was well supported and facially persuasive. Therefore, Dr. Good's opinion constitutes substantial evidence as a matter of law of defendant's mental incompetence. In order to reject Dr. Good's opinion, the trial court relied on its own experience interacting with defendant — an approach we expressly rejected in *Rodas*, *supra*, 6 Cal.5th 219, where we said that "in the face of substantial evidence raising a doubt about defendant's competence, defendant's demeanor and responses supplied [the trial court with] no basis for dispensing with further inquiry" in the form of proceedings under sections 1368 and 1369. (*Id*. at p. 234.)

Moreover, we have said that the trial court's "duty to assess competence is a continuing one." (*Rodas*, *supra*, 6 Cal.5th at p. 236, fn. 5.) Here, therefore, we also appropriately consider

defendant's conduct during trial in deciding whether a doubt was raised about defendant's mental competence. As noted, Dr. Good found defendant incompetent to stand trial because defendant lacked the ability to consult rationally with counsel. In that regard, Dr. Good mentioned defendant's "grandiosity" and his "hostility at those who [took] seriously his predicament," both of which were a result of his mental illness. Defendant's bizarre behavior at trial served only to confirm and reinforce Dr. Good's conclusions. Indeed, even behavior that would be insignificant if viewed in isolation tended cumulatively to present an overall picture of a man whose behavior reflected the precise traits Dr. Good described. There is no reason to reiterate each detail of defendant's bizarre behavior at trial, but it is worth noting a few examples of defendant's conduct that validated Dr. Good's opinion. For example, defendant repeatedly insisted that he had done a good thing by killing Julie and Paul, and that the children appreciated it. He admitted that he did not mind killing people, saying that only his sense of morality kept him from being a serial killer and that he would kill people when, in his moral judgment, it was necessary to do so. In addition, defendant repeatedly insulted the jurors, calling them "lumpers," "comically challenged," and "midgets." Finally, defendant sabotaged his own defense because of anger over perceived slights, and he repeatedly expressed his violent intentions regarding lawyers. These incidents and others evidence his "grandiosity" and "hostility at those who [took] seriously his predicament," thus supporting Dr. Good's finding that defendant lacked the ability to consult rationally with counsel.

In reaching this conclusion, we are mindful of the Attorney General's references to defendant's relative sophistication.

Critically, in advancing these arguments, the Attorney General, like the trial court, fails to address the crux of Dr. Good's opinion as to defendant's mental incompetence. Dr. Good acknowledged that defendant had a relatively sophisticated understanding of criminal procedure, but Dr. Good concluded that defendant's mental illness led to a grandiosity and emotional indifference that prevented him, in practice, from consulting rationally with counsel. Thus, the evidence the Attorney General relies on misses the point.[12]

---

[12] The Attorney General also relies on *Sattiewhite*, *supra*, 59 Cal.4th 446, and *People v. Weaver* (2001) 26 Cal.4th 876 (*Weaver*), in support of his argument that the evidence of defendant's mental incompetence was not sufficiently substantial. In *Sattiewhite*, the sole evidence of the defendant's mental incompetence was a psychologist's penalty phase testimony that the defendant had brain damage and mental disabilities. There was no evidence that these diagnoses affected the defendant's ability to understand the nature of the proceedings or to consult rationally with counsel. The circumstance presented in *Sattiewhite* was thus completely unlike the circumstance presented here. (See *People v. Mai*, *supra*, 57 Cal.4th at p. 1034 [expert opined as to defendant's mental limitations but did not directly address competence to stand trial]; *People v. Lewis*, *supra*, 43 Cal.4th at pp. 524–526 [same]; *People v. Young* (2005) 34 Cal.4th 1149, 1217–1218 [same]; *People v. Danielson* (1992) 3 Cal.4th 691, 723–727 [same].)

In *Weaver*, *supra*, 26 Cal.4th 876, the psychiatrist who testified that the defendant was mentally incompetent based his conclusion on the defendant's in-court demeanor, not on a formal examination of the defendant. The trial court in *Weaver* said: " 'I just quite frankly don't believe that a doctor can from the witness stand, when he is not examining a patient or not even observing a person except secondarily to his testimony, can render an opinion like that . . . .' " (*Id.* at p. 953.) This court

We conclude, therefore, as a matter of law that Dr. Good's report " 'raise[d] a reasonable or bona fide doubt' as to competence" (*Rodas*, *supra*, 6 Cal.5th at p. 231, quoting *People v. Rogers* (2006) 39 Cal.4th 826, 847), and the trial court was required to proceed in accordance with sections 1368 and 1369. It did not do so and thus erred.

### 2. *Competence To Waive Counsel*

As noted, defendant not only asserts generally that he was not competent to stand trial, he also asserts more specifically that he was not competent to waive his Sixth Amendment right to counsel.

The analysis here is a close cousin to our analysis of the competence-to-stand-trial issue because, as explained, each issue is governed by the same standard. (See *Godinez*, *supra*, 509 U.S. at p. 398.) To be mentally competent a defendant must have (1) " 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding' " and (2) " 'a rational as well as factual understanding of the proceedings against him.' " (*Dusky*, *supra*, 362 U.S. at p. 402; see § 1367, subd. (a).) Applying that standard, we conclude that Dr. Good's report was, as a matter of law, substantial evidence of defendant's incompetence to waive his right to counsel. (See *Pennington*, *supra*, 66 Cal.2d at p. 518.) Specifically, Dr. Good concluded that defendant's mental illness led to a grandiosity

---

agreed. (*Ibid.*) Obviously, Dr. Good's report, based on three formal examinations of defendant and appropriate psychological testing, is not comparable to the expert opinion that was before the trial court in *Weaver*.

and emotional indifference that prevented him from consulting rationally with counsel.[13]

It might be argued that a defendant who intends to waive counsel does not need to be able to consult with counsel, and therefore the first prong of the *Dusky* standard does not apply when competence to waive counsel is at issue. The argument fails as a matter of logic because a defendant who is represented and is considering whether to waive counsel needs to consult with counsel in order to understand and weigh the pros and cons of that decision. Moreover, defendant here made clear that he sought to proceed pro se primarily because of his dysfunctional relationship with counsel. Therefore, his decision to proceed pro se arose from and was integrally connected to his mental illness. Indeed, Dr. Good's opinion rested at least in part on an assessment that defendant's paranoia and delusional moral stance made him unable to rationally weigh whether to proceed with counsel. Because defendant's mental illness motivated his desire to waive counsel, we are at a loss to understand how his

---

[13] The Attorney General argues that this case is like *People v. Taylor* (2009) 47 Cal.4th 850, in which we concluded that the trial court did not err in finding the defendant competent to waive his right to counsel. (See *id.* at pp. 878–879.) *Taylor*, however, is easily distinguished given the substantial evidence of defendant's mental illness before us in the present case. In *Taylor*, we said: "There was no evidence before the trial court of psychosis or any severe thought disorder, and neither expert opined that defendant would be unable to assist counsel because of a mental illness. Defendant clearly had a history of conflict with his attorneys, but the court could reasonably conclude, without contradiction from either psychologist's report, that such conflicts were attributable to difficult aspects of defendant's personality rather than to a diagnosed mental illness." (*Id.* at pp. 863–864; see *id.* at pp. 860–861.)

decision to dismiss counsel provides a justification for disregarding his mental illness. (See p. 39, fn. 11, *ante*.)

Our conclusion that the trial court erred finds support in *People v. Burnett* (1987) 188 Cal.App.3d 1314 (*Burnett*). In *Burnett*, the defendant was institutionalized after being found not guilty of criminal fraud charges by reason of insanity. At a subsequent hearing to determine whether he was " 'restored to mental competence,' " the defendant waived his right to counsel. (*Burnett*, at p. 1317.) The trial court granted the waiver without obtaining "expert evidence regarding [the defendant's] mental capacity" (*ibid.*), and it did so despite several bizarre and delusional statements the defendant made during his court appearances and despite his history of mental illness (see *id.* at p. 1321). The Court of Appeal reversed. It held that "where a trial court's doubt about a person's mental competence to waive counsel is based upon a history of mental illness or irrational behavior directly observed in the courtroom, or any other discernible facts 'which would give rise to any doubt respecting defendant's mental capacity' [citations], the court cannot properly determine that such person is competent to exercise the right asserted without first obtaining psychiatric evidence." (*Id.* at p. 1322.) Although *Burnett* did not involve the question of competence to waive counsel during the course of a guilt trial, it generally supports our conclusion that the trial court here erred by finding defendant competent and granting defendant's waiver of counsel without initiating the competence proceedings set forth in sections 1368 and 1369.

It is true that in *People v. Clark* (1992) 3 Cal.4th 41 (*Clark*), this court came to a different conclusion from *Burnett*, but we find *Clark* distinguishable from this case. In *Clark*, a capital case, the defendant sought to waive counsel, and defense

counsel requested a hearing concerning the defendant's capacity to " 'act in pro per' " and "offered to present the testimony of two psychological experts to show 'that [the defendant] shouldn't be permitted to go pro per because of his mental and character disabilities.' " (*Clark*, *supra*, 3 Cal.4th at p. 106.) The trial court declined to hold a hearing and found — on the basis of a colloquy in which the court advised the defendant about his constitutional rights and the risks of self-representation — that the defendant was mentally competent to waive his right to counsel. (*Ibid*.) We affirmed. Quoting *Burnett*, *supra*, 188 Cal.App.3d at page 1322, we acknowledged that " '[w]here . . . [a] person whose competence is in question is confined in a mental facility pursuant to judicial decree and the state maintains that such confinement should continue or be extended because that person continues to suffer a mental disability [citations], mental competence to waive counsel is in doubt as a matter of law and such a person cannot be found competent to represent himself or herself without judicial consideration of psychiatric evidence bearing on the question.' " (*Clark*, at p. 107.) We then distinguished *Burnett*, noting that the defendant in *Clark* "gave no indication of mental impairment which prevented a valid waiver of counsel." (*Ibid*.) We did not, however, disturb *Burnett*'s ultimate holding that when a doubt arises about a defendant's mental competence to waive the right to counsel, "the court cannot properly determine that such person is competent to exercise the right asserted without first obtaining psychiatric evidence." (*Burnett*, at p. 1322.)

The defendant in *Clark* argued on appeal that his attorney's request for a hearing coupled with his own disruptive behavior in the courtroom — which included standing mute in

protest of the court's rulings, accusing the judge of lying, telling the judge to "stop that crap," and refusing to cooperate with counsel — should have raised a doubt in the court's mind about his competency. (See *Clark*, *supra*, 3 Cal.4th at p. 107.) We disagreed, concluding that although these "were relevant factors for the court to consider, they did not eliminate the court's discretion in light of its own observations and the record as a whole." (*Id*. at pp. 107–108.) In other words, they did not constitute substantial evidence of mental incompetence "as a matter of law." (*People v. Mai*, *supra*, 57 Cal.4th at p. 1033.) We noted that the defendant's disruptive behaviors during trial "did not necessarily show incompetence to waive counsel" because "[o]ne can knowingly invoke the right to represent oneself and then abuse that right." (*Clark*, at p. 108.) In addition, we pointed out that when defense counsel requested a hearing, his request was focused on the issue of self-representation, not competence to enter the waiver, and counsel "never made a specific offer of proof regarding what the witnesses would or could testify about [the] defendant's competence to waive counsel." (*Ibid*.) We therefore concluded that "the trial court's refusal to hold a further hearing was within its discretion." (*Id*. at p. 107)

*Clark*, *supra*, 3 Cal.4th 41, is distinguishable from this case because here the record included — in the form of Dr. Good's report — credible and detailed psychiatric evidence indicating that, due to severe mental illness, defendant was not mentally competent to waive his right to counsel. That evidence satisfied *Pennington*'s substantial evidence standard as a matter of law (*Pennington*, *supra*, 66 Cal.2d at p. 518), thus triggering the competency procedures set forth in sections 1368 and 1369.

### 3. *The Trial Court's Hearings Did Not Satisfy Section 1369*

Finally, we reject the Attorney General's argument that any error here was harmless because the two brief hearings at which the trial court considered Dr. Good's report constituted, by themselves, a competency trial that satisfied section 1369. Section 1369 requires the appointment of a mental health expert (or, in some cases, two such experts) (§ 1369, subd. (a)), followed by a jury trial, including the formal admission of evidence, argument, and a verdict (*id*., subds. (b)–(f)). Those procedural requirements were not satisfied in the two brief hearings that occurred here.

Accordingly, we conclude that the trial court erred by failing to initiate the formal competency procedures set forth in sections 1368 and 1369. We next consider whether, under the circumstances presented here, a retrospective evaluation of defendant's competence to stand trial is feasible.

## D. Retrospective Competency Trial

The Attorney General argues that if we conclude, as we have, that the trial court erred by not initiating the competency procedures set forth in sections 1368 and 1369, the remedy is a conditional reversal so the trial court can consider the feasibility of holding a retrospective competency trial. As we shall explain, a retrospective competency trial is not a harmless error inquiry. Rather, it is an opportunity to cure the trial court's error by giving the defendant a competency trial that is comparable to the one he or she should have been given but was denied. In the present circumstances — involving the passage of more than a dozen years — that is not possible to do.

In cases involving *Pate v. Robinson* error — that is, a failure to hold a competency hearing despite substantial evidence of a defendant's incompetency (see *Pate v. Robinson, supra,* 383 U.S. at pp. 385–386) — the United States Supreme Court has reversed the judgment without ordering an inquiry into the feasibility of making a retrospective competency determination. In *Dusky*, for example, the high court spoke of the "difficulties of retrospectively determining the petitioner's competency as of more than a year ago," and it reversed the judgment of conviction without directing any further proceedings. (*Dusky, supra,* 362 U.S. at p. 403.) And in *Pate v. Robinson* itself, the high court noted that at a retrospective competency hearing, "[t]he jury would not be able to observe the subject of their inquiry, and expert witnesses would have to testify solely from information contained in the printed record." (*Pate v. Robinson,* at p. 387.) The court added that the passage of time (six years in that case) "aggravates these difficulties" (*ibid.*), and it declined to permit a retrospective competency hearing. Likewise, in *Drope v. Missouri* (1975) 420 U.S. 162 — another case in which six years had passed since the relevant events — the high court noted "the inherent difficulties of such a *nunc pro tunc* [competency] determination under the most favorable circumstances," and it concluded that such a determination would not be possible in the case it was then deciding. (*Id.* at p. 183.)

This court, too, has never expressly held that a retrospective competency determination is adequate to cure *Pate v. Robinson* error. (See *Rodas, supra,* 6 Cal.5th at p. 239 [assuming without deciding that the remedy of a retrospective determination is available]; *People v. Lightsey* (2012) 54 Cal.4th 668, 704 (*Lightsey*) [declining to answer the "complex and . . .

debat[able]" question]; *People v. Ary* (2011) 51 Cal.4th 510, 516–517 (*Ary*) [assuming without deciding that the remedy is available]; *People v. Young* (2005) 34 Cal.4th 1149, 1217, fn. 16 [noting that "in some circumstances, a remand may be appropriate and reversal . . . might be unnecessary"]; *People v. Marks* (1988) 45 Cal.3d 1335, 1340 [reversing the judgment, observing, "[t]hat the hearing was not held is dispositive"]; *People v. Hale* (1988) 44 Cal.3d 531, 541 [absence of competency trial "rendered the subsequent trial proceedings void because the court had been divested of jurisdiction to proceed"]; *Pennington, supra,* 66 Cal.2d at p. 521 [rejecting the argument that "the error be cured by a retrospective determination of defendant's mental competence during his trial"]; see generally *Rodas,* at pp. 238–240.) To understand these holdings, it is important to understand the nature of the retrospective competency trial that our cases permit, an issue we now turn to.

Significantly, we have held that the *defendant* has the burden of proof in a retrospective competency trial. In *Rodas,* we said so explicitly: "The burden of proof in a retrospective hearing is on the defendant . . . ." (*Rodas, supra,* 6 Cal.5th at p. 240.) Similarly, in *Lightsey,* we said that "a retrospective competency hearing [must] provide defendant a fair opportunity to prove incompetence." (*Lightsey, supra,* 54 Cal.4th at p. 710, italics omitted.) And in *Ary,* we said that "requiring a criminal defendant to prove at a retrospective mental competency hearing that he was incompetent when tried earlier does not ' "offend[] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." ' " (*Ary, supra,* 51 Cal.4th at pp. 520–521.) Those statements might sound odd to someone familiar with the harmless error standards that apply on appeal. When there is a retrospective

competency trial, there has necessarily been a finding of trial court error, and if the case involves *Pate v. Robinson* error, the error is one that violates the federal Constitution. It is well settled that in a criminal case involving federal constitutional error, an appellate court can affirm the conviction only if "the beneficiary of [the] constitutional error" — the People — can "prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." (*Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*).) Why then in a retrospective competency trial does the defendant have the burden of proof to show he or she was incompetent at the time of the trial, and therefore that the trial court's *Pate v. Robinson* error was prejudicial?

The answer lies in the fact that a retrospective competency trial is not a harmless error inquiry, nor is it an unconstrained post hoc inquiry into a defendant's mental condition at some earlier point in time. Rather, a retrospective competency trial provides a defendant with an opportunity to have a competency trial comparable to the one the defendant should have been given but was denied — one in which the defendant would have had the burden of proof (see *Ary, supra,* 51 Cal.4th at p. 518; *People v. Medina* (1990) 51 Cal.3d 870, 881; see also § 1369, subd. (f) ["It shall be presumed that the defendant is mentally competent . . . ."]). Hence, in *Ary,* we said: " '[After a feasibility finding, t]he defendant *will be placed in a position comparable to the one he would have been placed in* prior to the original [guilt] trial. *Under these circumstances,* no due process violation occurs by ultimately placing the burden of proving incompetency on the defendant in a retrospective hearing.' " (*Ary,* at p. 520, quoting *Tate v. State* (Okla.Crim.App. 1995) 896 P.2d 1182, 1188, italics added; see *Rodas, supra,* 6 Cal.5th at p. 241

[reaffirming this statement from *Ary*]; *Lightsey*, *supra*, 54 Cal.4th at p. 710 [same].)

Significantly, if the defendant will not " 'be placed in a position comparable to the one he would have been placed in' " (*Ary*, *supra*, 51 Cal.4th at p. 520), then a retrospective competency trial is not feasible. (See *Rodas*, *supra*, 6 Cal.5th at p. 241 ["[W]e conclude no retrospective competency hearing could ' "place[] [defendant] in a position comparable to the one he would have been placed in prior to the original trial." ' "]; see also *id.* at p. 240 ["To saddle defendant with the burden of proving his incompetence in March 2014, around five years after the fact, without the benefit of any contemporaneous psychiatric, psychological, or neurological evaluation, would neither be fair nor produce a reliable result."].) When a court is determining whether conditions are sufficiently comparable for a fair hearing and a reliable result, relevant considerations include: " ' " "(1) [t]he passage of time, (2) the availability of contemporaneous medical evidence, including medical records and prior competency determinations, (3) any statements by the defendant in the trial record, and (4) the availability of individuals and trial witnesses, both experts and non-experts, who were in a position to interact with [the] defendant before and during trial.' " ' " (*Ary*, at p. 520, fn. 3.) If conditions cannot be made comparable to those that would have prevailed at the omitted hearing, a hearing to inquire into the defendant's mental condition at some earlier point in time would exceed the narrow framework that we considered in *Ary*, *supra*, 51 Cal.4th 510, when we concluded it was consistent with federal due process for the defendant to bear the burden of proof. Instead, it would be "nothing but a harmless error determination in disguise" (*James v. Singletary* (11th Cir. 1992) 957 F.2d 1562,

1571, fn. 14), and the People would bear the burden of proving defendant's competency beyond a reasonable doubt (see *Chapman*, *supra*, 386 U.S. at p. 24).

Applying *Ary*'s due process analysis to this case, we conclude that it is not feasible here to place defendant " 'in a position comparable to the one he would have been placed in prior to the original [guilt] trial' " (*Ary*, *supra*, 51 Cal.4th at p. 520; see *Rodas*, *supra*, 6 Cal.5th at p. 241; *Lightsey*, *supra*, 54 Cal.4th at p. 710). Therefore, a retrospective competency trial at which defendant bore the burden of proof would violate the due process clause of the federal Constitution's Fourteenth Amendment. (*Ibid.*)

Consistent with our conclusion here, we note first that in this case the passage of time since the omitted hearing (13 years) is much longer than — more than double, in fact — the time gaps in *Pate v. Robinson* and *Drope v. Missouri*, where the United States Supreme Court declined to order a retrospective hearing, and the gap in *Rodas*, where we did the same. Nor can we conclude that that factor is outweighed here by others we identified in *Ary*, *supra*, 51 Cal.4th at page 520, footnote 3. Aside from Dr. Good's report itself, the Attorney General does not point to any specific evidence, such as mental health records prepared contemporaneously with Dr. Good's report, that would now place defendant in a position comparable to his position in 2008, thus making a retrospective competency trial feasible. The Attorney General asserts that medical personnel had contact with defendant during the relevant time period and that these contacts likely resulted in written reports, but despite being prompted by a letter from this court to address the feasibility of a retrospective competency trial, the Attorney General does not state what medical questions those reports

addressed. More specifically, the Attorney General does not assert that the reports analyzed defendant's mental illness in relation to his ability to consult rationally with counsel.

The Attorney General also points out that defendant testified extensively at trial, and therefore the trial transcript could permit a mental health expert to retrospectively evaluate defendant's competence. Moreover, the Attorney General argues that Dr. Good's report includes lots of information that defendant could use at a retrospective competency trial and that the prosecution could use in an attempt to draw a conclusion different from Dr. Good's. The Attorney General also notes that several people who interacted with defendant during the relevant time period (including his attorneys, the prosecutor, and Dr. Good himself) might be able to appear as witnesses at a retrospective competency trial.

But given the passage of time and the corollary difficulty of reconstructing defendant's mental state at the time of trial, none of that potential evidence could possibly place defendant " 'in a position comparable to the one he would have been placed in' " if a timely competency trial had been held in 2008. (*Ary*, *supra*, 51 Cal.4th at p. 520, quoting *Tate v. State*, *supra*, 896 P.2d at p. 1188.)

It is true, as the Attorney General argues, that we ordered an inquiry into the feasibility of making a retrospective competency determination in *Lightsey*, *supra*, 54 Cal.4th 668, but that case, unlike the one now before us, did not involve *Pate v. Robinson* error. In *Lightsey*, when a doubt arose about the defendant's competence to stand trial, the trial court conducted a *timely* competency trial, and the defendant was able to develop his medical evidence, but the trial court erred because the

statutory obligation to provide counsel at such a trial (see § 1368, subd. (a)) was not honored. (See *Lightsey, supra,* 54 Cal.4th at pp. 699–702.) Under those unique circumstances — involving state-law error, not a federal constitutional violation — we concluded that the trial court should at least consider whether a reliable retrospective competency determination might be feasible. (*Lightsey,* at pp. 706–710.) We reasoned that it might be possible for the trial court to retry the question of competency, taking advantage of the developed evidentiary record but giving the defendant the benefit of counsel that he lacked at his original competency trial. Because of the existence of the prior competency trial, the problem of expert witnesses having to testify solely from information gleaned from a printed record (see *Pate v. Robinson, supra,* 383 U.S. at p. 387) was, as we put it, "potentially reduced." (*Lightsey,* at p. 707.) In short, *Lightsey* is nothing like this case, in which there was no timely, although procedurally invalid, competency trial.

Precedent from the high court and this court leaves little flexibility regarding the retrospective competency trial that is permitted to cure *Pate v. Robinson* error. Where the defendant is to bear the burden of proof, the trial must place the defendant in a position comparable to the one he would have been in at a timely competency trial. (*Ary, supra,* 51 Cal.4th at p. 520.) Assuming such a trial might be feasible in some cases, we conclude that such a trial is not feasible here. (See *Rodas, supra,* 6 Cal.5th at pp. 239, 241.)

### III. CONCLUSION

The judgment is reversed in its entirety. Defendant may be retried if the trial court concludes, at the time of such retrial,

that he is mentally competent.  If defendant again seeks to represent himself, the trial court has discretion, depending on the medical evidence, to deny self-representation.  (See *People v. Johnson, supra*, 53 Cal.4th at pp. 530–531.)

**JENKINS, J.**


**We Concur:**

**CANTIL-SAKAUYE, C. J.**
**CORRIGAN, J.**
**LIU, J.**
**CUÉLLAR, J.**
**KRUGER, J.**
**GROBAN, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Wycoff

_____

**Procedural Posture** (see XX below)
**Original Appeal** XX
**Original Proceeding**
**Review Granted (published)**
**Review Granted (unpublished)**
**Rehearing Granted**

_____

**Opinion No.** S178669
**Date Filed:** August 23, 2021

_____

**Court:**  Superior
**County:** Contra Costa
**Judge:** John William Kennedy

_____

**Counsel:**

David A. Nickerson, under appointment by the Supreme Court, for Defendant and Appellant.

Kamala D. Harris and Rob Bonta, Attorneys General, Gerald A. Engler, Chief Assistant Attorney General, Jeffrey M. Laurence, Assistant Attorney General, Glenn R. Pruden, Alice B. Lustre, Roni Dina Pomerantz and Basil R. Williams, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

David A. Nickerson
5 Astor Circle
Santa Fe, NM 87506
(505) 954-1942

Basil R. Williams
Deputy Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102
(415) 510-3885