Filed 11/9/22  P. v. Hernandez CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yolo)

----

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | C094814 |
| v. | (Super. Ct. No. CRF20156956) |
| MICHAEL ISAIAH HERNANDEZ, | |
| Defendant and Appellant. | |

The People charged defendant Michael Isaiah Hernandez with various crimes after he sexually assaulted and severely injured his former girlfriend.  Prior to trial, the trial court found many times that defendant lost and then regained competency to stand trial.  It twice confined him to a state hospital, and it authorized hospital staff to involuntarily administer antipsychotic medication.

Shortly before the jury rendered its verdict in the guilt phase of trial, defense counsel again expressed a doubt about defendant's competence.  The trial court declined to hold another hearing to evaluate defendant's competence, explaining that it had not heard anything new.

1

The jury found defendant guilty on all but one count and found him sane at the time of his offenses. The trial court sentenced defendant to an aggregate determinate term of 22 years four months and an aggregate indeterminate term of life with the possibility of parole.

Defendant now contends (1) the trial court should have held another hearing to evaluate defendant's competency to stand trial, and (2) there is insufficient evidence to support the jury's findings that (A) he was sane at the time he assaulted his former girlfriend, and (B) that he attempted to dissuade a witness from making a report to law enforcement.

We agree with defendant's first contention and reject the remaining two. When a formerly incompetent defendant has been restored to competence through medication, evidence that the defendant is no longer taking his medication and is again exhibiting signs of incompetence will generally establish a change in circumstances and calls for additional investigation before trial may proceed. (*People v. Rodas* (2018) 6 Cal.5th 219, 223 (*Rodas*).) Because the facts in this case establish such a change in circumstances, the trial court needed to suspend proceedings and conduct a further competency hearing. We will reverse the judgment.

BACKGROUND

A

The trial court divided the trial into two phases: a guilt phase to consider whether defendant committed the charged crimes, and a sanity phase to consider whether defendant was sane at the time he committed the alleged offenses. (See § 1026, subd. (a).)

In the guilt phase, E.M. testified that she had known defendant for a decade and dated him on and off for four years. Her testimony focused on the events of November 28, 2015. At that time, she was 16-years-old and defendant was 18-years-old. A few months before, the two had broken up around a time when defendant started acting

2

odd. E.M. understood that defendant had been diagnosed with schizophrenia and bipolar disorder and had concerns about his mental health.

After their separation, E.M. and defendant remained close friends. On November 28, 2015, they met at a library and then grabbed food at a McDonald's. After eating, E.M. told defendant she needed to go home. Defendant carried her backpack but, when E.M. asked for it back, he refused to give it to her and walked in the direction opposite her destination. He then told her to go with the flow, refused to explain where they were going, and asked why she needed to walk in the other direction.

On passing the gate of a cemetery, E.M. again asked about their destination. Defendant called her a bitch, said she was being dramatic, and said they were going to a vacant house where he had lived. But defendant instead pulled her into a narrow passageway in the cemetery. He choked her, tried to kiss her, and tried to put his hands down her pants. He told E.M. to pull her shirt down and, when she refused, he pulled her shirt down and bit her breast. He told her to just let it happen, but she continued to try to break free. Defendant said he did not want to hurt her, he loved her, and he wanted her.

Defendant pulled E.M. deeper into the cemetery and behind a mausoleum. He threw her to the ground, pinned her arms down with his knees, and got on top of her. He told E.M. to "give it up," which she understood to mean he wanted to have sex with her. He pulled out his penis, indicated he wanted to place it in her mouth, and threatened to hit her if she bit it. When E.M. tried to avoid his penis, defendant hit her about five times. E.M. told defendant he was hurting her, but he said, "Fuck that," and continued hitting her. She screamed for help.

E.M. attempted to escape defendant and ran toward the cemetery's exit. Defendant caught her and threw her to the ground. He choked her, pulled off her leggings, said he was a pimp, and told her to let it happen. After defendant continued to physically abuse E.M., including stomping on her face and stomach, E.M. agreed to go with him to the vacant house. Defendant held her hair as they left the cemetery and

3

walked down the street. E.M. begged bystanders to call the police, saying defendant was trying to rape her and she was only 16-years-old. Defendant denied trying to rape her and told her to shut up. According to E.M., he told a man, "No cops."

Two witnesses testified about seeing defendant and E.M. One saw an escalating argument between a male and a female, returned to her home, and told a friend to monitor the situation or call 911. She then called a nonemergency police line and said she saw a male push a female into the cemetery while the female screamed "No." Another bystander saw a man pulling a bloodied and half-naked girl down the street by her hair. The girl screamed for help but, every time she did, the man punched her two or three times and then continued pulling her down the street. The bystander called 911, chased after the two, and yelled at the man to let her go. The man eventually let the girl go and fled.

The assault left E.M. with bleeding in her brain, a broken nose, bruising around her right eye, abrasions to both forearms, and an injury to her large intestine.

The People charged defendant with kidnapping for rape and oral copulation (Pen. Code, § 209, subd. (b)(1)),[1] assault with intent to commit a sex crime on a minor (§ 220, subd. (a)(2)), false imprisonment with force and violence (§§ 236, 237, subd. (a)), sexual battery (§ 243.4, subd. (a)), infliction of corporal injury on a former dating partner (§ 273.5, subd. (a)), kidnapping (§ 207, subd. (a)), attempting to prevent or dissuade a witness by force or threat from making a report to law enforcement (§ 136.1, subd. (c)(1)), and attempting to prevent or dissuade a witness from making a report to law enforcement (§ 136.1, subd. (b)(1)). The information also alleged that defendant inflicted great bodily injury within the meaning of section 12022.8 in connection with the assault charges, and that he inflicted great bodily injury within the meaning of section 12022.7,

---

[1] Undesignated statutory references are to the Penal Code.

4

subdivision (e) when he inflicted corporal injury on a former dating partner.  Defendant ultimately pleaded not guilty by reason of insanity.

The jury found defendant not guilty on one of the two counts for attempting to prevent or dissuade a witness, but found him guilty on the remaining counts.  The jury also found true the enhancement allegations.

B

Before the start of trial, the trial court found that defendant lost and regained competency a number of times.  It first declared a doubt about his competence in late 2015, and subsequently found him incompetent, after a psychologist (Dr. Juliana Rohrer) twice found him incompetent following two separate evaluations.  During the first evaluation, Dr. Rohrer found defendant "laying on his bunk with his head under the covers."  Although defendant removed the covers when Dr. Rohrer approached, he refused to speak to her.  During the second evaluation, defendant again refused to speak to Dr. Rohrer.  After both evaluations, Dr. Rohrer wrote that defendant's unwillingness to participate in a psychiatric evaluation, to sign for a release of information on his medical history, and to speak to his attorney "is indicative of very poor judgment"—which "is often a symptom [of] a psychotic condition."  She added that defendant "is currently unwilling to cooperate in a rational manner with counsel in presenting a defense."

Following a court-ordered commitment to a state hospital in May 2016, the hospital diagnosed defendant with two mental disorders—bipolar disorder with psychotic features and antisocial personality disorder.  After a period of involuntary administration of an antipsychotic medication, the hospital found defendant cooperative, recommended he be returned to court as competent to stand trial, and recommended he "remain on his prescribed medications."  In August 2016, the trial court found defendant competent and reinstated proceedings.

In January 2017, the trial court again declared a doubt about defendant's competence.  Dr. Rohrer again attempted to evaluate defendant.  Although defendant at

5

first refused to leave his cell, he eventually agreed to meet Dr. Rohrer. But after Dr. Rohrer explained the purpose for her visit, he told her, "I don't want to talk with you." He also told an officer, "I won't talk to her," and instructed the officer to relay the message to Dr. Rohrer. After this limited observation, Dr. Rohrer found defendant competent. She stated, as in her prior reports, that defendant's unwillingness to participate in a psychiatric evaluation and to sign for a release of information on his medical history "is indicative of very poor judgment," which "is often a symptom of a psychotic condition." But this time, she added that his conduct "could also be due to antisocial behavior" and that defendant's behavior probably stemmed from antisocial traits. In reaching this conclusion, she found it significant that he "exhibited a clear thought process, had specific goals in mind[,] followed instructions when he wanted to do so," "clearly instructed others to do his bid[d]ing," and exhibited no signs of psychosis. But she emphasized her conclusion was based on limited information -- she only briefly observed defendant and had not been given any records to confirm a psychotic disorder, including no records from his recent commitment at the state hospital. Following a competency hearing in February 2018, where defendant testified and expressed an understanding of the nature of the proceedings, the trial court found him competent and reinstated proceedings.

In August 2018, the trial court declared doubt for the third time after defense counsel said defendant failed to understand the trial process. Before the scheduled competency hearing In October 2018, a psychiatrist (Dr. Captane Thomson) sought to meet with defendant but, as with Dr. Rohrer, defendant refused to speak to him. After reviewing defendant's paper history, including the records from his treatment at the state hospital, Dr. Thomson concluded that "he will require further psychiatric evaluation and treatment to help restore his capacity to cooperate rationally with counsel in the preparation of his defense." Dr. Thomson afterward attempted to speak to defendant on the day of the competency hearing, but defendant only said, "I plead the Fifth." As in the

6

earlier competency hearing, defendant testified and expressed an understanding of the nature of the proceedings.  He also, when asked why he refused to speak to Dr. Thomson, claimed he "*did* want to talk to the doctor."  (Italics added.)  But when asked why he nonetheless did not speak to Dr. Thomson, he said, "[I]t wasn't important."  He then added, "I'm a doctor"; "I've been a doctor as of 2010."  At the close of the hearing, the trial court again found defendant competent and reinstated proceedings.  Although it accepted that defendant had a mental disorder and that it may be difficult to have sustained communications with him "because of the psychosis," it found the evidence insufficient to find defendant incompetent.

In May 2019, the trial court declared doubt for the fourth time after defense counsel noted defendant's attempted escape from jail, his refusal to speak with counsel, his stated belief that he was at court because he was the victim of a sexual assault, and his general demeanor and incoherence.  Dr. Rohrer afterward found defendant incompetent.  Although defendant agreed to speak with Dr. Rohrer, he had difficulty talking with her and appeared to respond to "internal stimuli."  He also at times gave nonsensical answers (e.g., he tried to escape jail because of "culture shock"), was delusional (e.g., he thought he was younger than he was), laughed for no reason, silently moved his lips "as if talking with someone who was not there," and tracked with his eyes "something that was not there."  Dr. Rohrer added that defendant exhibited signs of paranoia, such as refusing to speak with clinicians and attorneys trying to help him.  Under the circumstances, she found defendant was "not able to cooperate in a rational manner with counsel in presenting a defense."  After considering Dr. Rohrer's report, along with the parties' agreement on the matter of incompetence, the trial court found defendant incompetent in July 2019.

For nearly a year afterward, defendant remained in treatment and subject to a court order authorizing involuntary administration of an antipsychotic medication.  He was first admitted to a competency treatment program and diagnosed with unspecified

schizophrenia spectrum and other psychotic disorders. He was afterward committed to a state hospital and diagnosed with schizophrenia and amphetamine-type substance abuse disorder. At the hospital, he claimed he was 19 (he was 22), thought the year was 2001 (it was 2020), occasionally appeared to respond to internal stimuli, occasionally appeared delusional and confused, evidenced disorganized thinking, had difficulty communicating, and had difficulty understanding his charges, pleas, and the role of some of the courtroom players. He also, among other things, declined staff efforts to explain the charges against him, reasoning first that his mother "knew information in the police report that she would tell him" and later that he had no need to hear the charges because his case was closed, saying "my mom is here to pick me up."

After several months in the state hospital, and despite the administration of antipsychotic medication, the hospital informed the trial court that defendant was not yet competent to stand trial. The hospital explained that defendant would likely regain competence with continued treatment, and that without such treatment he likely would not.

After several more months of treatment, the hospital found defendant cooperative, competent, and able to assist his counsel. Although defendant initially said he did not like his attorney because the attorney continued his case, defendant subsequently said he understood his attorney could have had valid reasons for his actions and defendant would "consult with his attorney on his best course of action." The trial court found defendant competent in July 2020.

In October 2020 the trial court ordered another mental health evaluation for a purpose other than evaluating defendant's competency to stand trial. It directed a psychologist, Dr. Robert Wagner, to evaluate, among other things, whether defendant was sane at the time he committed the alleged offenses and whether he had improved to such an extent that he was no longer a danger to the health and safety of others. Dr. Wagner afterward attempted to perform the evaluation but, like with Dr. Rohrer and

8

Dr. Thomson, found defendant unwilling to speak to him. Attempting to perform his evaluation without speaking to defendant, he learned defendant stopped taking medication in July 2020 immediately upon return to the county jail from hospital custody. After reviewing jail records, Dr. Wagner said defendant generally appeared to perform well despite being unmedicated for his schizophrenia, but he noted one apparent active symptom of his illness: an inability to cooperate. He said the only thing that brought about cooperation was involuntary medication, adding: "If an involuntary order can be made for the administration of medication for [defendant], that will likely restore him to competency without the need for rehospitalization."

In June 2021, the trial court ordered the local sheriff's department to transport defendant to court for trial. When a lieutenant visited defendant's cell and informed him of the trial court's order, defendant was lying down under a blanket. Defendant pulled the blanket down to see who was speaking to him, but when the lieutenant told him he needed to go to court, defendant pulled the blanket back up over his head. Defendant said "yes" when asked if he understood the order and, according to the lieutenant, indicated he understood that he could ask correctional staff to transport him. Based on this conduct and defendant's alleged inability to assist in the defense, defense counsel expressed a doubt about defendant's competence, adding that he always believed defendant was incompetent. But defense counsel indicated he had no other new information, and it appears the trial court did not understand defense counsel to be asking for another competency hearing. The trial took place in June 2021.

Shortly before the jury rendered its verdict on guilt, defense counsel again expressed a doubt about defendant's competence. Defense counsel briefly spoke to defendant after defendant asked to be transported to court. According to defense counsel, defendant understood that defense counsel served as his attorney. But when asked questions on topics such as the nature of the proceedings and the role of a judge, defendant did not respond. According to defense counsel, defendant was bouncing

9

around like he was extremely nervous and was generally nonresponsive. He was also very disheveled and appeared not to have groomed himself in quite some time. The trial court declined to declare a doubt, explaining that it had not heard anything new.

C

After the guilt phase of the trial, the trial court proceeded to the sanity phase, in which the jury considered defendant's defense of insanity. That is, it considered whether the evidence showed that defendant, because of his mental disorder, was incapable of knowing or understanding the nature and quality of his acts or of distinguishing right from wrong at the time of his crimes. (See § 25, subd. (b).)

Defendant's grandmother testified that defendant talked to himself and isolated himself from others in the weeks before he assaulted E.M. She also said he was paranoid, scared, and expressed concern that people would come and get him. She added that her mother and niece are schizophrenic. In addition, defendant's sister testified defendant was a "different person" in the weeks before the assault, though she struggled to provide details.

Two experts also testified. Dr. Thomson, a psychiatrist with decades of experience, testified for defendant. Dr. Wagner, a clinical psychologist who also had decades of experience, testified for the prosecution. Neither expert had an opportunity to meet with defendant, as defendant rejected both their efforts to meet.

Dr. Thomson began with a review of defendant's mental health records. At age 14, defendant presented with oppositional defiance disorder, which can be marked by aggression. Over a year later, a doctor diagnosed defendant with psychosis, mood disorder, and major depressive disorder with psychotic features. A month later, after defendant reported suicidal thoughts attributable to being molested by a man when he was 13-years-old, a county mental health staff member diagnosed defendant with post-traumatic stress disorder and depressive symptoms. A month later, another county mental health staff member diagnosed defendant with a psychotic disorder and a mood

10

disorder after defendant reported hearing voices that told him to kill himself and others. Seven months later, a psychiatrist diagnosed defendant with acute psychosis and prescribed him antipsychotic medication after defendant reported auditory hallucinations and an uncontrollable desire to hurt himself. A month later, after defendant caused himself to bleed while incarcerated, a psychologist diagnosed him with post-traumatic stress disorder (perhaps attributable to being forcefully sodomized in the past) and provisionally diagnosed him with unspecified schizophrenia or other psychotic disorder.

After summarizing defendant's mental health history, Dr. Thomson stated that defendant likely had schizophrenia, a mental health illness with symptoms including disorganized thoughts, perceived threats, social withdrawal, and an inability to express emotions. Dr. Thomson found defendant's conduct to be an example of someone suffering from a major mental illness, likely schizophrenia. But he added that, the mental illness notwithstanding, some of defendant's conduct tended to show that he nonetheless understood his conduct was wrong and did not want the police called. That included defendant's threatening consequences to E.M. and telling her to shut up when she asked bystanders to call the police.

Dr. Wagner also testified that defendant had a severe mental disorder, likely schizophrenia. He testified that schizophrenics, despite their disorder, can still understand the nature and quality of their acts and distinguish right from wrong. After considering conduct like defendant's in the form of a hypothetical, he testified that such conduct tended to show the actor both understood the nature and quality of his acts and was able to distinguish right from wrong at the time he acted. He stated, for instance, that capturing a victim, bringing her to a private area, and telling her to give it up after removing her leggings, would show the actor knew the nature and quality of the act in which he was trying to engage.

The jury found defendant sane at the time of the offenses.

11

DISCUSSION

I

Defendant contends the trial court should have held another hearing to evaluate his competence in June 2021.

A

Section 1367 prohibits a trial court from trying or convicting a criminal defendant who is mentally incompetent -- who, as a result of a mental health disorder or developmental disability, is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner. (*Id.*, subd. (a).) The constitutional guarantee of due process imposes the same prohibition. (*Rodas*, *supra*, 6 Cal.5th at p. 230; see also *Drope v. Missouri* (1975) 420 U.S. 162, 172 [43 L.Ed.2d 103] [the "test of incompetence . . . seeks to ascertain whether a criminal defendant ' "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding -- and whether he has a rational as well as factual understanding of the proceedings against him" ' "].)

Section 1368, among other statutes, describes the procedure for evaluating a defendant's potential incompetence. It "requires that criminal proceedings be suspended and competency proceedings be commenced if 'a doubt arises in the mind of the judge' regarding the defendant's competence ([§ 1368], subd. (a)) and defense counsel concurs (*id.*, subd. (b))." (*Rodas*, *supra*, 6 Cal.5th at p. 231.) The California Supreme Court "has construed that provision, in conformity with the requirements of federal constitutional law, as meaning that an accused has the right 'to a hearing on present sanity if he comes forward with substantial evidence that he is incapable, because of mental illness, of understanding the nature of the proceedings against him or of assisting in his defense.' [Citation.] 'Once such substantial evidence appears' " -- that is, once evidence raising a reasonable or bona fide doubt as to competence appears -- " 'a doubt as to the sanity of

12

the accused exists, no matter how persuasive other evidence . . . may be to the contrary.' [Citation.]" (*Ibid.*)

A trial court's duty to conduct a competency hearing may arise at any time prior to judgment, even if the defendant has already been deemed competent at a prior hearing. (*Rodas*, *supra*, 6 Cal.5th at p. 231.) But once a defendant is found competent to stand trial after a competency hearing, a trial court may rely on that finding unless presented with a substantial change in circumstances or new evidence casting a serious doubt on the validity of that finding. (*Ibid.*) The requirement of a substantial change in circumstances or new evidence serves "to make clear that the duty to suspend is not triggered by information that substantially duplicates evidence already considered at an earlier, formal inquiry into the defendant's competence; when faced with evidence of relatively minor changes in the defendant's mental state, the court may rely on a prior competency finding rather than convening a new hearing to cover largely the same ground." (*Id.* at pp. 234-235.)

B

Defendant argues the trial court was presented with substantial evidence of his incompetence in June 2021 and that the circumstances at that time had substantially changed from those prevailing in July 2020, when defendant was last found competent to stand trial.

All the experts who evaluated defendant found him incompetent to stand trial during the periods when he was unmedicated. Dr. Rohrer, who first evaluated defendant in January 2016, initially found him incompetent after he refused to participate in a psychiatric evaluation, to sign for a release of information on his medical history, and to speak with his attorney. She found all that indicative of very poor judgment which she said is often a symptom of a psychotic condition. She later repeated those findings in a subsequent evaluation. Although, after her third evaluation in July 2017, Dr. Rohrer deemed defendant competent, she found him incompetent after obtaining more

13

information in July 2019.  At that time she found defendant had difficulty talking with her, appeared to respond to internal stimuli, occasionally gave nonsensical answers, and was delusional.  She found that he presented as paranoid in stating he did not trust his attorney and in refusing to speak to his attorney.  Considering these symptoms, Dr. Rohrer diagnosed defendant with mood disorder and other specified schizophrenia spectrum and other psychotic disorder.  Dr. Thomson reached a similar conclusion in September 2018, that defendant suffered from a psychosis and was incompetent.

The state hospital also found defendant incompetent during two separate commitments.  In the first commitment, hospital staff diagnosed defendant with bipolar disorder with psychotic features and antisocial personality disorder; and in the second commitment, staff diagnosed him with schizophrenia and amphetamine-type substance abuse disorder.  During both commitments, the hospital found defendant incompetent to stand trial before the forced administration of medications, stating, for instance, that defendant had difficulty communicating and was occasionally delusional.  Although the hospital found medication ultimately returned defendant to competency during both commitments, it recommended that defendant remain on his prescribed medications and explained that defendant's illness required treatment with psychotropic medications.

Following defendant's release after the second of his hospital commitments, Dr. Wagner found him incompetent in November 2020.  After defendant refused to speak with him, Dr. Wagner learned that defendant stopped taking his medication immediately after he left hospital custody and returned to the county jail.  Dr. Wagner noted that defendant generally appeared to perform well despite being unmedicated for his schizophrenia, but found that defendant nonetheless appeared to have one active symptom of his illness:  an inability to cooperate.  He added:  "The only thing that has brought about cooperation is involuntary medication."  He then wrote:  "If an involuntary order can be made for the administration of medication for [defendant], that will likely restore him to competency without the need for rehospitalization."

14

This record was known to the trial court when it declined to declare a doubt in June 2021.  At that time, the trial court had before it Dr. Wagner's report showing that defendant had ceased taking his medication, that defendant appeared unable to cooperate because of his schizophrenia, and that further involuntary medication would be necessary to restore his competency.  The trial court also knew that defendant had repeatedly refused to speak to his counsel during this time and behaved oddly when he finally agreed to see his counsel.  During that meeting, according to defense counsel, defendant understood that defense counsel was his attorney.  But when asked questions on topics such as the nature of the proceedings and the role of a judge, defendant did not respond; he was bouncing around like he was extremely nervous and generally nonresponsive.  Defense counsel added that defendant was very disheveled and appeared not to have groomed himself in quite some time.

"Taken as a whole, this information constituted substantial evidence of mental incompetence.  The facts made known to the trial court raised a reasonable doubt as to whether defendant was able to communicate rationally with his attorney and thus 'to assist counsel in the conduct of a defense in a rational manner.'  [Citation.]"  (*Rodas*, *supra*, 6 Cal.5th at p. 233.)

The People argue to the contrary, noting that in declining to a declare a doubt under these circumstances, the trial court said defense counsel had offered nothing new since the earlier finding of competence in July 2020.  According to the trial court, defendant had often refused to meet with defense counsel.  But as far as we can tell from the record, defendant refused to meet with his counsel at times when he was unmedicated.  Nothing in the record suggests he refused to meet at times when he was medicated.  And although the record shows he generally refused to cooperate with mental health professionals while unmedicated, it shows he generally cooperated with medical professionals when he received antipsychotic medications.  That suggests defendant's failure to cooperate stemmed largely from his untreated mental disorder rather than from

15

an unwillingness to cooperate.  Dr. Wagner's findings in November 2020 support this conclusion.

The People nevertheless point to Dr. Rohrer's 2017 report as evidence that defendant's lack of cooperation stemmed from an unwillingness rather than an inability to cooperate.  It is true that Dr. Rohrer indicated at the time that defendant's refusal to meet with his counsel probably followed from his antisocial behavior and an unwillingness to cooperate, not a psychotic condition.  But she also noted that she had no records to confirm a psychotic disorder and only a brief interaction with defendant.  Two years later, Dr. Rohrer had more information and concluded that defendant's failure to cooperate with his counsel evidenced paranoia, not merely antisocial behavior, and his mental disorder precluded him from assisting his counsel.

Dr. Rohrer's later findings resulted in defendant being committed to a state hospital and involuntarily medicated for nearly a year.  When defendant ceased taking his medication following his release from hospital custody in July 2020, refused to meet with his counsel, and decided to remain under a blanket in his cell rather than show for trial, that tended to show that circumstances had changed substantially since the last competency hearing in July 2020.

We are sympathetic to the difficulty a trial court faces in managing a case such as this with a defendant who repeatedly cycles on and off of medication.  But we must also follow controlling law, including the guidance from the California Supreme Court.  On this record, the trial court should have conducted another competency hearing under section 1368.  As the Supreme Court explained, "[a]s a general rule, once a defendant has been found competent to stand trial, a trial court may rely on that finding absent a substantial change of circumstances.  But when a formerly incompetent defendant has been restored to competence solely or primarily through administration of medication, evidence that the defendant is no longer taking his medication and is again exhibiting signs of incompetence will generally establish such a change in circumstances and will

16

call for additional, formal investigation before trial may proceed." (*Rodas*, *supra*, 6 Cal.5th at p. 223.) Those are the facts of this case. Defendant ceased taking his medication and exhibited renewed signs of incompetence sufficient to establish the requisite substantial change in circumstances. "In the face of such evidence, [the] trial court's failure to suspend proceedings violate[d] the constitutional guarantee of due process in criminal trials." (*Ibid.*)

C

Having concluded that the trial court should have suspended proceedings to conduct another competency hearing, we now address the remedy. Defendant claims we must reverse his convictions, but the Attorney General argues we should remand the matter to the trial court to determine whether a retrospective competency hearing is feasible. We agree with defendant.

"[A] retrospective competency trial provides a defendant with an opportunity to have a competency trial comparable to the one the defendant should have been given but was denied -- one in which the defendant would have had the burden of proof." (*People v. Wycoff* (2021) 12 Cal.5th 58, 93.) But if the defendant will not be placed in a position comparable to the one he would have been in, a retrospective competency trial is not feasible. (*Id.* at p. 94.) To determine feasibility, courts consider (1) passage of time, (2) availability of evidence, including medical records and prior competency determinations, (3) statements by defendant in the trial record, and (4) availability of witnesses, both expert and non-expert. (*Ibid.*)

Considering the facts here, we conclude it is not feasible to conduct a retrospective competency trial. "[T]he dominant considerations are the fluctuating nature of defendant's symptoms, the passage of time, and the lack of contemporaneous expert evaluations." (*Rodas*, *supra*, 6 Cal.5th at p. 240.) The most recent expert evaluation, as the Attorney General notes, occurred about seven months before trial. The trial occurred a little over a year ago. But the record shows that defendant fluctuated between

17

competency and incompetency during relatively short periods of time. In October 2018, for instance, the trial court deemed defendant competent, but seven months later the trial court declared a doubt and ultimately found him incompetent. In July 2020, the trial court again deemed defendant competent, but five months later, Dr. Wagner found defendant incompetent after he ceased taking his medications.

Under these circumstances, "it is difficult to see how a psychologist or psychiatrist appointed to make a retrospective evaluation could reliably find defendant was nonetheless competent at the time of trial." (*Rodas*, *supra*, 6 Cal.5th at p. 241.) That is particularly true given that the most recent expert evaluation -- Dr. Wagner's evaluation seven months before trial -- found that defendant appeared incompetent. Because the trial court could not fairly come to a reliable conclusion that defendant was competent during trial, we decline to remand for a retrospective evaluation.

## II

Defendant next contends there is insufficient evidence to support the jury's findings (A) that he was sane at the time of his crimes, and (B) that he attempted to dissuade a witness from making a report to law enforcement in violation of section 136.1. Although our conclusion in part I above already requires reversal, consideration of these additional arguments is necessary because, if defendant's claims here are persuasive, principles of double jeopardy would limit the scope of any subsequent prosecution. (*People v. Superior Court (Marks)* (1991) 1 Cal.4th 56, 62, 78; see also *id.* at p. 72 ["double jeopardy 'prohibits retrial after a conviction has been reversed because of insufficiency of the evidence' "]; *id.* at p. 72, fn. 14 [a defendant "may preserve for himself whatever double jeopardy benefits accrued in his first trial notwithstanding some fatal defect in the proceedings"].)

## A

We turn first to the jury's finding that defendant was sane at the time of the crime.

Under California law, persons who are mentally incapacitated are deemed unable to commit a crime as a matter of law. (§ 26, par. Two.) Mental incapacity under section 26 is determined by the *M'Naghten* test for legal insanity set forth in section 25, subdivision (b). (See *M'Naghten's Case* (1843) 8 Eng.Rep. 718, 722.) Under that standard, insanity is established if the defendant was unable to understand the nature and quality of the criminal act, or to distinguish right from wrong when the act was committed. (*People v. Elmore* (2014) 59 Cal.4th 121, 140.) We review a jury's finding that a defendant was sane at the time of the offenses for substantial evidence. (*People v. Powell* (2018) 5 Cal.5th 921, 957 (*Powell*).) We consider the entire record in the light most favorable to the jury's determination and affirm if the determination is supported by evidence that is reasonable, credible and of solid value. (*Ibid.*)

Substantial evidence supports the jury's finding that defendant was legally sane at the time of his crimes. Two experts testified on the topic: Dr. Thomson testified for defendant, and Dr. Wagner testified for the prosecution. Both agreed defendant suffered from a major mental illness, likely schizophrenia. Both also agreed defendant's conduct -- including his threats of consequences to E.M. and telling her to shut up when she asked bystanders to call the police -- demonstrated an understanding that his actions were wrong. Both experts, at the very least, indicated that defendant evidenced an ability to distinguish right from wrong when he acted.

Dr. Wagner went further. He testified that schizophrenics, despite their disorder, can still understand the nature and quality of their acts and distinguish right from wrong. Then, after considering a hypothetical schizophrenic who engaged in defendant's same conduct, he concluded that the conduct demonstrated an understanding of both the nature and quality of the acts and the legally and morally wrong nature of those acts. He testified that capturing a victim, bringing her to a private area, and telling her "to give it up" after removing her leggings would show the actor knew "the nature and quality of the act that he was trying to engage in." He testified that pulling a victim from a public street

19

to a more private area would indicate trying to hide, trying to avoid being caught, and "go to knowing whether or not something was morally or legally wrong." And he testified that fleeing after police were called, yelling at people not to call the police, and stating consequences if the victim failed to do desired conduct, would all tend to show the actor knew his actions were legally and morally wrong.

Such evidence was sufficient to support the jury's finding of sanity. (See *Powell*, *supra*, 5 Cal.5th at p. 957 [it is enough that a jury's finding of sanity "is supported by evidence that is reasonable, credible, and of solid value, from which a reasonable trier of fact could find the defendant sane by a preponderance of the evidence"].)

Defendant nevertheless argues the expert testimony suffered from a material flaw, in that neither expert had spoken with defendant. But defendant offers nothing showing that mental health experts are incapable of rendering an opinion about a defendant when the defendant refuses to speak with them. Nor do we find any reason for making this conclusion here. The law, after all, generally permits experts to " 'render opinion testimony on the basis of facts given "in a hypothetical question that asks the expert to assume their truth." ' " (*People v. Boyette* (2002) 29 Cal.4th 381, 449 [adding that " 'a hypothetical question must be rooted in facts shown by the evidence' "].)

Defendant further argues that his decision to go to a more private area for a sexual encounter did not show that he understood the encounter to be morally or legally wrong, it only showed that he understood public sex to be unacceptable. Defendant suggests the former would evidence sanity while the latter would not, but we are not persuaded that the distinction makes a difference in this context. In any event, Dr. Wagner concluded that moving a victim to a more private area would tend to show that the actor understood his actions were legally and morally wrong, and the jury was free to accept Dr. Wagner's interpretation of the evidence rather than defendant's preferred interpretation. (See *Powell*, *supra*, 5 Cal.5th at p. 958 [finding a jury could rely on two experts' opinions on

20

sanity when "their qualifications and the nature of their testimony" showed their opinions "were of sufficient quality"].)

B

We turn next to the jury's finding that defendant violated section 136.1.

Section 136.1, as relevant here, makes it a crime to attempt to prevent or dissuade a crime victim from making a report of that victimization to a law enforcement officer. (*Id.*, subd. (b)(1).) In the trial court the prosecution argued defendant violated the statute when he told E.M. to shut up and hit her after she yelled at bystanders to call the police. Challenging the sufficiency of the evidence on appeal, defendant claims that telling E.M. to shut up did not establish the specific intent to dissuade a crime report.

Considering the context of defendant's instruction to shut up, we are satisfied that defendant had the specific intent to prevent the reporting of a crime. E.M. testified that she asked bystanders to "call the cops" because defendant was trying to rape her, and, in response, defendant told her to shut up. E.M. also testified that defendant separately told a man, "No cops." On these facts, a jury could conclude that defendant had the specific intent to prevent the reporting of a crime, the one matter defendant claims the evidence fails to establish. (See *People v. Wahidi* (2013) 222 Cal.App.4th 802, 806 ["If the defendant's actions or statements are ambiguous, but reasonably may be interpreted as intending to achieve the future consequence of dissuading the witness from testifying, the offense has been committed."].)

Defendant argues we cannot consider the evidence that defendant told a man "No cops," because that fact was the basis for a separate count on which the jury acquitted him. While it is true that one of the counts for dissuading a witness was premised on defendant's alleged "[n]o cops" statement to an unknown man and that the jury acquitted defendant on that count, there is no indication the jury acquitted defendant because it concluded defendant did not make the statement. At trial, defense counsel never claimed that defendant did not make the statement; he instead suggested the jury could acquit

21

because that was all defendant said and nothing more. In any event, as we have explained, that statement is not the only evidence that defendant violated section 136.1. His contention lacks merit.

## DISPOSITION

The judgment is reversed. The matter is remanded to the trial court for further proceedings consistent with section 1368 and applicable law.


                                      /S/
                                 MAURO, J.


We concur:


     /S/
ROBIE, Acting P. J.


     /S/
KRAUSE, J.